STATE OF IOWA, Appellee, v. C. R. BRUNTLETT, Appellant.

No. 47281.

(Reported in 36 N. W. 2d 450)

MARCH 8, 1949.

David E. Burrows, of Council Bluffs, for appellant.

Robert L. Larson, Attorney General, Don Hise, First Assistant Attorney General, and Don H. Jackson, County Attorney, for appellee.

WENNERSTRUM, J.—The defendant was charged in an indictment returned by the grand jury of Pottawattamie county with the crime of first-degree murder. It was therein alleged that the defendant, C. R. Bruntlett, on or about the 8th day of December, 1947, while in the perpetration or the attempt to perpetrate the robbery of Percy Smith, wilfully, deliberately and with malice aforethought killed him. The defendant later entered a plea of guilty. The court thereafter heard evidence for the purpose of ascertaining what the punishment should be. A sentence of death by hanging was imposed. The defendant has appealed from the judgment entered.

It is our duty, under section 793.18, 1946 Code, to examine the record, without regard to technical errors or defects which do not affect the substantial rights of the parties, and render such judgment on the record as the law demands. We have carefully scrutinized the entire proceedings and the evidence presented. Because of the imposition of the death penalty by the trial court we deem it advisable to set out a summarization of the matters presented to the trial court, as a basis for our

ultimate consideration of the entire record, as well as the grounds submitted to us for our review.

The appellant was taken into custody on the day following the commission of the crime—December 9, 1947. On December 13, 1947, he admitted killing Smith under circumstances hereinafter related. The indictment was returned on January 8, 1948. On January 10, 1948, the appellant appeared in court with an attorney other than the one who later represented him in the trial court and entered a plea of "not guilty." He and his counsel were informed there would be an assignment of jury cases made on January 17, 1948. The case was assigned for trial for February 3, 1948.

It is shown by the clerk's transcript that on January 29, 1948, the appellant through his counsel, who now appears in this court in his behalf, filed a motion for continuance wherein it was stated that his attorney had been appointed during the midafternoon of January 27, 1948; that prior to said time appellant and his counsel had never known each other and had never conferred about the charge then pending. It was therein further stated that the crime charged was a serious one; that it would require a large amount of research and considerable time in investigating the various phases of the case on the part of his attorney; that the appellant was held without bail; that interviews between the appellant and his attorney were difficult and that it would be in the interests of a fair and impartial conduct of the trial if said cause was continued until the next term of court. The application for continuance was denied.

On February 3, 1948, the date on which the case against the appellant was set for trial he and his counsel appeared in open court where the appellant stated he desired to change his plea of "not guilty" to that of "guilty" to the charge of murder in the first degree; that he had been fully advised by his counsel as to his legal rights and that he had determined for himself to make such change in his plea. The court then set the next day, February 4, as the time when both the State and the appellant could make such showing as they desired "for the purpose of assisting the court in determining the punishment and the de-

gree of murder to be adjudged against the defendant." The court passed sentence and judgment on February 9, 1948.

The appellant at the time of the commission of the crime charged was a farmer fifty years of age and married. On or about November 30, 1947, he borrowed a .22 caliber rifle and seven shells from one of his neighbors. On the Friday prior to December 8, which would be December 5, he went to the home of Percy J. Smith and conferred with him. Earlier on this day and at a time when Mr. Smith was not at home the appellant had been at the Smith residence and made inquiry of Mrs. Smith if her husband would be interested in the purchase of some cattle. On Monday, December 8, he returned and he and Mr. Smith left about seven o'clock in the morning. Later that day Mrs. Smith received a telephone call from Omaha and a man who identified himself as Lundgren informed her that her husband had gone to Kansas to buy cattle and would be back in two or three days.

By reason of the absence of Mr. Smith officers were called to investigate. It is shown the appellant cashed a check for $9800 drawn on the account of the deceased on which check there had been written "for sixty head." During the investigation the appellant informed the officers that he purchased the cattle he claimed to have sold to Smith at Norfolk, Nebraska. As a means of investigating this phase of the case, the sheriff and a special agent of the Iowa Bureau of Criminal Investigation drove to Norfolk on December 13. While these parties were there, according to the testimony of Max Studer, the special agent, the appellant admitted to him the following facts: That the story about the sixty head of cattle which he was supposed to have bought at Norfolk, Nebraska, on Saturday, November 29 was false; that he had made up that story to get Percy Smith to his farm; that he, the appellant, had lost a considerable amount of money gambling during the past three years, particularly during the past three months; that he had purchased a farm near Creston on which he owed a $5000 payment on February 1, 1948; that he picked Percy Smith as a person from whom he could obtain money because he knew he was worth a considerable amount of money; that on Friday, December 5,

he had gone to the Smith home to confer with Mr. Smith but he was not there during the morning which necessitated his return during the afternoon; that they talked about cattle and Smith said he would come out early Monday morning to look at the sixty head which Bruntlett had; that Bruntlett stated he would come and get him; that he did so about seven o'clock on that day; that they went to the appellant's farm where he had some cattle in the yard and out in the field. Appellant further related in his admissions to the witness, Studer, that he was desperate for money and that he told Smith he knew he had a lot of it; that he took a .22 caliber rifle which he had in a small building and pointed it at Smith and threatened to kill him and forced him to make out a check for $9800 made payable to C. R. Bruntlett with a notation on it "for sixty head"; that Smith gave the check to the appellant and then grabbed the rifle and tried to get it away from Bruntlett but the appellant succeeded in keeping him from doing so; that Smith kept coming towards Bruntlett and he then fired and hit Smith in the forehead with the first shot; that Smith went down on his knees and appellant then fired a second shot which killed the deceased. The appellant then, according to the testimony of Studer and the admissions made to him, dragged the body to a near-by cob pile and covered it with cobs; that he next took kerosene and poured it over the blood which was near a stock tank and set it afire until he thought all the blood had burned; that he then started a fire of the cob pile and tried to burn up the body, along with some dead animals; that he used cobs, boards, sacks and kerosene to do the burning; that he had difficulty in keeping the fire burning and he kept adding kerosene. The appellant then, according to the testimony of the witness, Studer, further admitted that after his noon meal that day he drove to Omaha from which place he called the Smith home; that he told Mrs. Smith her husband had gone to Kansas and when asked who was calling he stated Mr. Lundgren; that he informed Mrs. Smith her husband would be gone for two or three days; that he next went to a trucking company located south of Council Bluffs and arranged to have them haul twenty-five head of steers that he had to Omaha that evening; that

he then went to the Council Bluffs Savings Bank to cash the Smith check; that he had $1825 in cash on deposit; that he paid a $4460 mortgage on the cattle which he had sold; that he took out $2165 in cash and a certified check in the amount of $5000 and closed his account with the bank. He then returned home and found that the fire was low and a considerable amount of the body was unburned; that he then used a corn knife cutting it up so it would burn faster and put more kerosene on it. He then stated in his admission that after this had occurred Richard Smith, a son of the deceased, and the son's wife, came to the appellant's yard and he told Richard his father had purchased sixty head of steers from him and had taken them to Omaha and he had not seen him since; that after Smith left he then hurried the fire as fast as possible thinking that Richard Smith would return; that Smith and his sister did later return to the appellant's farm and at that time appellant was putting water on the fire; that after Richard Smith had left the second time the appellant scraped up the unburned small bones and the ashes and carried them over to the edge of a cornfield where he scattered them.

There is testimony of the neighbor from whom the appellant had borrowed the gun that on December 8, 1947, he saw a fire on the Bruntlett farm about 8:30 or a quarter of nine; that he still saw it burning about 10:30 (in the morning).

The witness L. H. Tyler, sheriff of Pottawattamie county, testified to the conversations he had with the appellant and of admissions made in his presence which were substantially the same as those related by the witness Studer. His details of the admissions by appellant relative to the killing of Smith are in substance as follows: That Smith made out the check and gave it to him (Bruntlett); that Smith then grabbed the rifle which Bruntlett held and tried to take it away from him but the appellant succeeded in keeping him from doing so; that Smith kept coming at Bruntlett and Bruntlett pushed him away two or three times and that as he came at him the third time he fired at him with the rifle and Smith went down on his knees; that he then fired the second shot. The appellant is quoted as saying, "that's the shot that killed him."

.The appellant testified at the hearing in his own behalf although he gave no details of the killing. He did testify, however, that in 1933 he was sent to a mental institution in St. Peter, Minnesota; that he was later let out of this institution but about six months after he had been released from it he was returned. He was then transferred from the state of Minnesota to the hospital for.insane at Clarinda; that he remained at the hospital at Clarinda for about five months. The records which were before the trial court and which have been certified to this court, show copies of the Clarinda State Hospital records concerning the appellant's condition which indicate that he was paroled on January 7, 1935, and that he was discharged as not cured but on parole.

The appellant's commitment and confinement in the Minnesota state institution justify setting out facts as to his prior activities. The information concerning his earlier years is disclosed in a written record of a mental examination made by two competent psychiatrists of Council Bluffs which was introduced in evidence. There were no objections to this report. It is therein disclosed that when he was twenty-three years of age he engaged in a bank robbery and was sentenced for this crime to the Anamosa State Reformatory for a life term; that his sentence was later commuted and after he had been in the reformatory for ten years and two months he was paroled. It is further shown that on or about April 7, 1933, he was charged with the crime of larceny of a team of horses in Noble County, Minnesota, and was sentenced to a term of two years in the state penitentiary of that state; that thereafter there developed some question as to the appellant's then mental condition, although as shown by records of the mental hospital there was some suspicion that he was feigning insanity. However, he was transferred to the state hospital for insane at St. Peter, Minnesota, where he was held for a certain length of time and then by reason of his Iowa residence was transferred to the state hospital for insane at Clarinda, Iowa. There is some evidence that during the time the appellant was in the state reformatory at Anamosa he had some form of facial paralysis. It is shown that at that time he was in the prison hospital for treatment. There was

further evidence of his having received other hospital treatment in the reformatory not in any way connected with his mental condition. The trial court in commenting upon his mental condition made this statement:

"From the subjective symptoms and from observation the psychiatrist at St. Peter's Hospital in Minnesota had diagnosed him as having psychosis with other somatic disease and encephalitis. The record shows the defendant gave rather a definite history of having suffered an attack of acute encephalitis while in the Anamosa Reformatory in 1926.

"The only historical fact that the court is able to find in the record that would justify the diagnosis of encephalitis or a possible encephalitis comes from the hospitalization for diphtheria while in his own cell in the State Reformatory at Anamosa, Iowa."

The trial court prior to the imposition of the sentence had the benefit of a mental examination of the appellant by two competent psychiatrists in Council Bluffs to which we have previously referred. It was their finding that the appellant presented no particular paranoid ideas and did not demonstrate any delusions, hallucinations or ideas of reference. It was their further finding that the appellant did not have a psychosis and there did not seem to be any evidence of any recent psychosis since his discharge from the Clarinda State Hospital. The court at the time of the imposition of the sentence held that it was his judgment that the appellant was sane "and in a responsible condition of mind at the time of the commission of this crime on December 8, 1947 * * *."

The appellant contends that he should have been given a life sentence instead of the extreme penalty imposed by the trial court. As propositions of law he asserts (1) that the Supreme Court may reduce a sentence if it is too severe or disproportionate to the degree of guilt (2) that premeditation and malice are essential elements of the crime of murder in the first degree and, it is apparently sought to be claimed, that these elements are not disclosed by the evidence (3) that the weight or preponderance of the evidence shows the insanity of

the appellant and consequently raises a reasonable doubt of his guilt.

I. It must be kept in mind that the appellant at no time pleaded as a defense that he was insane at the time of the commission of the crime. Likewise, no question was raised, at least by any pleading or oral statement presented in court, as to his mental condition at the time of the hearing on his plea of guilty. If appellant's sanity at the time of the proceedings in the trial court had been in doubt proper action should have been instituted to determine this question. Section 783.1, 1946 Code. However, the appellant in his appeal asks this court to review the decision of the trial court on its finding that appellant was sane. The question of his mental condition was discussed thoroughly by the trial court in its judgment and sentence even though that proposition was not raised in the manner provided by statute. The court's consideration of the possible insanity of the appellant at the time of the commission of the crime and subsequent thereto indicates its concern for the rights of the appellant.

This court is not now in a position to pass upon the question as to appellant's possible insanity at the time of the commission of the crime for which he plead guilty. If insanity is to be interposed for the purpose of suspending proceedings in a criminal case it must be raised before the end of the trial. State v. Tracy, 219 Iowa 1412, 1415, 261 N. W. 527; State v. Cooper, 169 Iowa 571, 582, 583, 151 N. W. 835. The question was not presented during the trial except perhaps inferentially as a basis for a plea for a life sentence. The burden of proof is upon appellant to establish by a preponderance of the evidence a claimed plea of insanity. State v. Buck, 205 Iowa 1028, 1033, 219 N. W. 17; State v. Maharras, 208 Iowa 127, 130, 224 N. W. 537; State v. Harrison, 167 Iowa 334, 339, 149 N. W. 452; State v. Thiele, 119 Iowa 659, 660, 661, 94 N. W. 256. A presumption of sanity is not overcome by the fact in itself that an atrocious crime has been committed. State v. Buck, supra. If it can be said that a plea of insanity was raised by the appellant in the trial court we cannot hold that he has met the burden of proof of establishing his insanity at the

time of the commission of the crime or subsequent thereto by a preponderance of the evidence. We further hold there is no merit, legal or factual, to the appellant's claim of insanity. Even if this question has been raised inferentially it cannot be held that a reasonable doubt as to his guilt by reason of his claimed insanity has developed unless this fact is shown by a preponderance of the evidence presented by appellant. State v. Branden-berger, 151 Iowa 197, 209, 130 N. W. 1065. This he has failed to do. If there is any doubt as to the appellant's present mental condition a statutory provision is provided for determining that fact. Section 792.5, 1946 Code.

II. Malice and an intent to kill may be inferred from the intentional use of a deadly weapon in a deadly manner. State v. Sullivan, 230 Iowa 817, 820, 298 N. W. 884. It has been the further holding of this court that upon a plea of guilty of first-degree murder it is necessarily presumed that the act was deliberate and premeditated. State v. Breeding, 220 Iowa 605, 608, 262 N. W. 467. Under the record we find and hold that malice and deliberation on the part of the appellant were shown in the commission of the crime.

III. We would be justified in setting aside or reducing the sentence in the instant case only if there is a clear showing of an abuse of the court's discretion in imposing the maximum penalty. State v. Breeding, supra; State v. Tracy, 219 Iowa 1412, 1419, 261 N. W. 527, 531; State v. Grattan, 222 Iowa 172, 176, 268 N. W. 489. We find no abuse of discretion. The evidence amply shows the commission of an atrocious crime. Under all the record presented we find no justification for holding that the sentence was too extreme. If there is justification for clemency that is a matter for executive action. State v. Olander, 193 Iowa 1379, 1385, 1390, 186 N. W. 53, 29 A. L. R. 306. This court cannot set aside the decision of the trial court unless we find there has been error committed by it. State v. Griffin, 218 Iowa 1301, 1312, 254 N. W. 841. We do not find error.

IV. Our examination of the entire record satisfies us that the rights of the appellant were fully considered, except perhaps in the failure to appoint an experienced attorney to represent appellant. But this failure is insufficient under the

record here to justify interference by us. We think it proper to suggest, however, that in a case such as this it is well to appoint an experienced attorney for the accused. Of course we intend no reflection upon appellant's attorney here. It is evident that the trial court made a very thorough study of the evidence relating to the appellant's sanity. It prepared and filed a judgment entry which discloses a thorough consideration of all the questions which were involved in this case even though they may not have been formally presented to it. The proceedings at all stages were carried on with deliberation. Under the record as submitted and the prior holdings of this court, we find no justification for modifying or reducing the penalty imposed. We therefore affirm.—Affirmed.

MANTZ, C. J., and HALE and SMITH, JJ., concur.

MULRONEY and HAYS, JJ., specially concur.

BLISS, OLIVER and GARFIELD, JJ., dissent.

HAYS, J. (specially concurring)—Appellant asserts three alleged errors as a basis for a reversal of the trial court's judgment.

I.    The court erred in imposing the death penalty, rather than life imprisonment. The indictment specifically charges first-degree murder, under section 690.2, Code of 1946. Appellant, after being fully advised, entered a plea of guilty thereto. The penalty is death or life imprisonment, to be determined by the jury, if a trial, and by the court, upon a plea of guilty. Under such a plea no hearing is necessary as section 690.4, Code of 1946 is not applicable. State v. Harper, 220 Iowa 515, 258 N. W. 886. The court held such a hearing but this fact cannot be prejudicial to the appellant, and after this hearing the court, in the exercise of its statutory discretion, imposed the death penalty. There is no abuse of discretion shown in the record.

II.    The second assigned error is that the record shows the act was an impulsive and sudden one, and not of a deliberate and premeditated nature. The plea of guilty eliminates this question. Furthermore, the record clearly shows that appellant

carefully planned the same. He first called at the Smith home to arrange for Smith to come to his farm and provided the transportation on the excuse of muddy roads. He procured a rifle and ammunition. He was desperate for funds, which Smith apparently could supply. A complete disappearance of the body was contemplated. It is not denied in the record that he, appellant, stated " 'if it hadn't been for Richard Smith coming to his place, he would have had time to burn the body up entirely.' " He had investigated and found a commission merchant at Omaha, named Lundgren, who had bought stock from Smith, and it was this name he used when he called the Smith home and advised them that Smith had gone to Kansas with a load of cattle, and would be gone for several days. The record shows the killing was deliberate and is a clear denial of an impulsive act.

III. The final assignment of error is that the evidence shows that defendant was probably insane at the time the crime was committed. Strictly speaking, this question is eliminated by the plea of guilty, and presents no question for review. However, section 793.18, Code of 1946, provides that when a defendant appeals, this court must examine the record without regard to technical errors or defects which do not affect the substantial rights of the parties and render such judgment as the law demands. It is also the rule of this court that in a criminal case, involving a grave offense and severe penalty, concise statement of the alleged error will not be required, if from the record, the claimed error can be ascertained. State v. Clay, 222 Iowa 1142, 271 N. W. 212.

Assuming that section 793.18 applies, where the case is submitted upon briefs and arguments; and assuming that the question of appellant's sanity is as of the time he appeared for sentence rather than at the time of the commission of the crime, the question presented is whether the trial court should have pronounced sentence or called a jury to determine as to appellant's sanity.

In my judgment, section 783.1, Code of 1946, which is referred to in the court's opinion, is not applicable, as no question of appellant's sanity is suggested until after the plea of guilty.

State v. Machovec, 236 Iowa 377, 17 N. W. 2d 843; State v. Mikesh, 227 Iowa 640, 288 N. W. 606. While State v. Arnold, 12 Iowa 479, is based upon this statute, the same was differently worded than the present one. However, sections 789.9, 789.7 and 789.8 would seem to be applicable, although the effect is the same as it would be under section 783.1.

Section 789.8 provides:

"If the court is of opinion that there is reasonable ground for believing him insane, the question of his insanity shall be determined as provided in this code, and if he is found to be insane, such proceedings shall be had as are herein directed."

This clearly provides that the reasonable ground for believing the defendant to be insane must be in the opinion of the trial court. The reasonable doubt contemplated is such doubt as arises after investigation and ascertainment of the facts, rather than before full knowledge thereof is had. While it was clearly the duty of the trial court, after the suggestion of appellant's sanity was raised, to investigate the facts and thereupon determine the question of the existence of a reasonable doubt, certainly the fact that an investigation was made does not, per se, show the existence of such a doubt. State v. Arnold, 12 Iowa 479.

The question to be determined was whether a reasonable doubt existed as to appellant having sufficient mentality to appreciate the charges against him and the proceedings thereon, and to enable him to make a proper defense. 23 C. J. S., Criminal Law, section 904; 24 C. J. S., Criminal Law, section 1569; 14 Am. Jur., Criminal Law, sections 45 and 49; In re Smith, 25 N. M. 48, 176 P. 819, 3 A. L. R. 83. In State v. Arnold, supra, we said at page 484 of 12 Iowa:

"A doubt must be raised whether at the time there is such mental impairment, either under the form of idiocy, intellectual or moral imbecility, or the like, as to render it probable that the prisoner cannot, as far as may devolve upon him, have a full, fair and impartial trial."

See also The People v. Perry, 14 Cal. 2d 387, 94 P. 2d 559, 124 A. L. R. 1123.

The facts before the trial court, as disclosed by the record, show: Appellant was sentenced to life imprisonment in 1922, for a bank robbery, but was paroled in 1931 and discharged in 1932. In 1933 he was charged with stealing horses, in Minnesota, and was confined in a mental hospital in that state for about six months. In 1934 he was transferred from the Minnesota hospital to the hospital at Clarinda, Iowa. In 1935 he was paroled "not cured," and, so far as the record shows, has never been finally discharged. The diagnosis from both the Minnesota and Clarinda hospitals at the time he left the institutions was that his mental reactions and symptoms were similar to, and could be explained in the terms of, chronic encephalitis and so diagnosed his case. At the time of the hearing appellant was examined by two psychiatrists who report that there was no evidence of any recent psychosis since his discharge from Clarinda. While this creates an apparent conflict in the testimony, it is not necessarily so, but even so, a mere conflict is not sufficient to raise a reasonable doubt. See People v. Carskaddon, 123 Cal. App. 177, 11 P. 2d 38.

We have held in civil cases that when one has been adjudged insane, there is a prima facie presumption that such condition continues until shown otherwise. Assuming appellant entitled to this presumption, still such presumption may be overcome by proof. In 1935 appellant was paroled from Clarinda allegedly suffering from chronic encephalitis. In 1948 he is declared by two psychiatrists as showing no signs of psychosis. He has lived for many years, since his parole in 1935, as an average individual, so far as the record discloses. The facts surrounding the killing clearly negative it as an impulsive act or the result of a harbored desire to kill.

In addition to the above record, the trial court had the opportunity to observe the appellant and his conduct, which we do not have. Under this record, I am not prepared to say that as a matter of law the facts before the trial court compelled it to entertain a real doubt with respect to appellant's sanity or his ability to understand the nature of the proceedings or to make a proper defense. This is what we must find, if this judgment is reversed. State v. Collins, 162 Kan. 34, 174 P. 2d 126.

I would affirm the judgment of the trial court.

MANTZ, C. J., and HALE, WENNERSTRUM, SMITH, and MULRONEY, JJ., join in this special concurrence.

MULRONEY, J. (specially concurring)—I concur in the opinions of Justice Wennerstrum and Justice Hays. I do not believe appellant's mental condition as to sanity or insanity at the time he pleaded guilty and was sentenced is presented by this appeal. But some of the members of the court feel we should examine the record to see if the trial court abused his discretion in not finding there was a reasonable doubt as to the defendant's sanity at the time of the hearing which resulted in the death sentence. Defendant's counsel raised no such issue in the trial court and does not here argue that defendant was insane at the time of sentence or that the trial court abused his discretion by not finding there was reasonable ground for believing the defendant insane at the time of the sentence. Since it was not urged in the trial court that he was then insane, the trial court had to judge from all the testimony, the actions and behavior of defendant when he was before him, the report of the doctors who examined defendant shortly before his plea and sentence, and the past history of defendant's insanity and institutional care.

The term "insanity" is a generic term, embracing all kinds and conditions of mental derangement. Beattie v. Bower, 290 Mich. 517, 287 N. W. 900. Thus the law applies certain tests to determine the quantum of mental competency necessary to legally contract, to make a will and to deed property and to do many other things. The tests of insanity of a defendant at the time of trial is thus stated in 44 C. J. S., Insane Persons, section 127:

"The test of insanity of an accused precluding his being put on trial for a criminal offense is usually stated to be his capacity to understand the nature and object of the proceedings against him and to conduct his defense in a rational manner; and, if he passes this test, he may be tried, although on some other subjects his mind may be deranged or unsound."

The statutes (sections 789.7 and 789.8, Code, 1946) seem to contemplate a showing by defendant of insanity as a legal cause against the pronouncement of judgment. The defendant produced no witness who said he was then insane. His counsel did not apparently suggest to the court that he might be then insane as did counsel in State v. Machovec, 236 Iowa 377, 17 N. W. 2d 843. There was no suggestion in the testimony of any of the witnesses that he was insane. There certainly was nothing in defendant's testimony that would lead one to believe he did not know or comprehend that he was being prosecuted for the deliberate murder of Percy Smith. There was nothing in his actions to suggest that he was so mentally deranged as to be unable to present adequately any defense that he had. True he said· he had not been "mentally well" for the last three or four months but he gave no indication that he was then so mentally sick that he did not know the nature of the proceedings or was not able to present his defense. He related his past history of the adjudication of insanity and institutional care with rather good memory and the hospital records support his testimony showing his discharge from Clarinda on parole as not cured in 1935.

About the only basis for even suspecting that he was so mentally deranged as not to know the nature and object of the proceedings against him or as not to be able to conduct his defense are the records of adjudication of insanity, his confinement in hospitals for the insane, and his discharge some twelve or thirteen years before the hearing, on parole as not cured. If the trial court had any suspicions that any serious mental derangement still existed, they were set at rest by the two psychiatrists who reported that there was no evidence of any present or recent psychosis.

I do not believe we should hold there is a presumption of insanity such as to preclude the sentencing for crime, merely from the record of prior adjudication of insanity and subsequent dismissal from an institution on parole with the notation "not cured."

Again I emphasize that this has nothing to do with insanity as a defense or insanity at the time of the commission

of the crime. .The plea of guilt establishes defendant's sanity at that time as effectively as if he pleaded not guilty, raised the defense of insanity at the time of the alleged criminal act, and was found guilty. We are only concerned with the mental condition of defendant at the time he appeared for sentence. And here the law has said the test of "insanity" is restricted to his capacity to understand the proceedings and conduct his defense.

Presumptions in the law of evidence have to do with burden of proof and the establishment of a prima facie case. It is true there is in many cases, where the issue is the insanity of a party, a presumption of continuing insanity arising from a prior adjudication of insanity, which aids him who asserts insanity and has the burden of proving its present existence. But the issue to be determined by the court under this statute is not defendant's sanity or insanity. When the showing of the defendant is made as a legal cause against the pronouncement of judgment, the trial court merely determines from the showing made whether there is a reasonable ground for believing the man before him is so mentally deranged as not to appreciate exactly the nature of the criminal charge against him and his relations to the proceedings, and not to enable him to make his defense. The evidence of prior adjudication of insanity is a part of the showing made. It is no more than that. It may or may not give rise to a presumption of insanity in a future hearing on that issue if one is ordered. But the prior adjudication is not such a presumption that compels a holding that reasonable grounds exist for believing defendant insane.

As said in State v. Noel, 102 N. J. Law 659, 671, 133 A. 274, 279:

"The fact that a person has been adjudicated a lunatic does not mean that he is exempt from prosecution for the commission of a crime. Insane persons may be adjudicated insane and be committed for the protection of the public against violence, or for the care and cure of the person committed, or for the conservation and management of the lunatic's property. A regular inquisition is not conclusive. In cases of confinement, where the confinement is made for the protection of the public

or for the care of the individual, the commitment is evidential of nothing more than a condition justifying the confinement. A commitment adjudges no more than that it is necessary to confine the patient for the good of the public or himself, or both. The fact that a person has been committed as insane has no necessary relation to the question whether such a person can intelligently go to trial for a crime. Persons having some forms of insanity are as responsible for crimes committed by them as normal persons. It was not error to put the defendant to a trial merely because he had been committed to a hospital for the insane."

See also In re Buchanan, 129 Cal. 330, 61 P. 1120; 50 L. R. A. 378, and People v. Cowan, 38 Cal. App. 2d 144, 100 P. 2d 1079.

The trial court made no specific finding that the showing was insufficient to establish reasonable ground for believing him insane at the time of sentence. As stated this was not argued. Of course the subsequent sentencing of defendant shows that in the court's opinion there was no reasonable ground for believing him so mentally deranged as not to understand the proceedings or so mentally deranged as not to be able to present adequately any defense that he might have had. I think his opinion is well supported by the record and it should not be reversed.

Most of appellant's brief is devoted to an argument that the death sentence should be reduced by this court to life imprisonment. No case is cited where that was ever done by this court but we have often held that in a proper case we will reduce the punishment if it is too severe. This power to reduce the sentence "will be exercised only when the court below has manifestly visited too severe a penalty, one disproportionate to the degree of guilt, as shown by the proof." State v. Olander, 193 Iowa 1379, 1382, 186 N. W. 53, 55, 29 A. L. R. 306.

The legislature, and not this court, declares the public policy of this state. The legislature has provided penalties of life imprisonment or death as punishment for the deliberate slaying and the duty of fixing the penalty is cast upon the district court when the defendant pleads guilty. The penalty

thus fixed in this case in the district court was warranted by the record. Our jurisdiction is appellate only. The views of the members of this court on the age-old issue of capital punishment are not important. We are limited both by law and conscience to the judicial function of faithfully interpreting and applying the law as we find it. With nothing in the record that would justify this court in interfering with the sentence, our reduction to life imprisonment would be commutation, a function reserved to the executive power. I concur in the affirmance of the case.

MANTZ, C. J., and HALE, WENNERSTRUM, SMITH, and HAYS, JJ., join in this special concurrence.

BLISS, J. (dissenting)—In attempting to solve a problem of the kind before the court a pertinent historical resumé of the defendant is helpful. The matters here stated are very largely from the reports of the hospitals for the insane at St. Peter, Minnesota, and at Clarinda, Iowa. The defendant was born in Carroll County, Iowa, July 6, 1897. He had three brothers and two sisters. His father died at the age of sixty-three in 1927 either from apoplexy or by being crushed by a stallion. His mother was sixty-three in 1933 and lives at Vail, Iowa.

The family lived on a farm. The record shows that defendant had an interest in two hundred eighty acres of land—probably the home farm. His schooling ended in the eighth or ninth grade of a country school. When he was sixteen or seventeen he had typhoid fever. The record shows no history of insanity in the family.

Just when he was married does not appear. He states, and there is nothing to the contrary in the record, that the cashier of a bank in Carroll county was in love with his wife, and that he induced Bruntlett to rob the bank of the cashier on a plan to split the booty with the latter with the real object of getting Bruntlett out of the way. For this offense the defendant was sentenced to imprisonment for life in the Reformatory at Anamosa, Iowa. He was received there February 22, 1922. His wife divorced him.

While he was in prison, and about 1925, he had a severe

attack of diphtheria. A little later he came near death from influenza. These attacks were followed by persistent and severe headaches, which preceded a stroke of paralysis that affected his left side.

His sentence at Anamosa was commuted to thirty years. On April 9, 1931, he was paroled, and in July 1932 he was given his final discharge. He went to his mother's farm and assisted her in farming and he dealt in horses and cattle. In the history which Drs. Ash and Mahoney of the Council Bluffs Clinic took from him in their examination of him on December 15, 1947, there is this statement:

"He * * * bought some stolen cattle and paid $600 for these. He told the man to whom he had given the check not to cash it for a few days, but the fellow did not pay any attention to him, and he was sentenced to the *County Jail in Cookley County* for five months. He then began to farm for himself again and in some way bought a team of stolen horses from a man. He was *taken back to Anamosa and was treated badly by the sheriff*."

The italicized words were either spoken or written inadvertently. Just where "Cookley County" is does not appear, and there is no evidence before this court that he was ever imprisoned at Anamosa a second time.

The purchase of the stolen horses was before April 7, 1933, as he was arrested in Iowa while in possession of the team, and was extradited to Minnesota and placed in the county jail of Worthington, Nobles County, Minnesota, on the date last given and charged with the larceny of the horses in that county. He states that the judge at Worthington tried to get him to tell more about the horse deal than he knew, and when he could not tell any more, the judge said: "I'll put you in a place where you will be glad to tell all to get out." He was placed in a hot cell and kept there without sufficient food until his weight was greatly reduced, and he became hysterical and emotional. He was put under observation, and it was decided to commit him to the St. Peter State Hospital, where he was taken. Just when he was committed does not appear, but a copy of the "Physician's Clinical Record" of July 14, 1933, in part, states:

"The upset commenced gradually about June 15, 1933 when the patient thought he had a message from the Lord to fly an aeroplane. It is increasing. He pounds and shouts that the Lord wants him to fly aeroplanes and warns him to avoid air pockets. *He has shown a disposition to injure others.*"

The commitment papers state:

"The conditions surrounding this patient are such that a suspicion of voluntary simulation of insanity is present. * * * About June 1, 1933 he began to make a disturbance in the jail and the sheriff at once concluded that the patient was pretending insanity. However, he consistently continued the manifestations and about five weeks ago Dr. P. W. Harrison, one of the examiners herein, was called to examine him. Dr. Harrison has seen him from time to time since, *and is satisfied there is some physical departure from normal in the patient, and concurs with Dr. Mork in believing that there may be mental aberration,* although all of us have a lurking suspicion that the whole thing may be a pretense of insanity put on by the patient for the purpose of avoiding trial on the criminal charge. * * * It has been decided by the examining board to recommend commitment to the State Hospital at St. Peter, Minnesota, as an insane patient but with the warning to the superintendent of that hospital to carefully guard him and insure that he does not escape, while at the same time keeping careful observation of his mental condition to determine whether his insanity is real or pretended. [Italics supplied.] [Both the Wassermann blood test and the Kline spinal fluid tests were negative for syphilis.]

"July 15, 1933. When admitted to the hospital it was difficult to get any information from the patient. The physician attempted to interview him but the patient said he did not remember his name and did not remember how long he had been in Minnesota, nor could he say where his home was. Unquestionably the patient is trying to simulate a psychosis. He was transferred to the Asylum for the Dangerous Insane today by authority of the State Board of Control.

"July 31, 1933. The patient has been getting along well

since he was transferred to the Asylum for the Dangerous Insane. When interviewed today he talked freely without any hesitation. He admitted that he was simulating the day he was admitted. He explained that by saying that the attendants had told him not to talk. * * * When asked about the difficulties he had in the jail at Worthington he said that he thought there was some kind of a third degree being worked on him. * * * He thought they were trying to make him confess to something he had not done. * * * He denies having any connection with the stealing of the horses but he said he knew they were stolen.

"August 25, 1933. This man is getting along quite satisfactorily here. He assumes a good attitude, talks freely and is no longer confused, but he does feel that the discomfort at the jail, the lack of ventilation and rather limited food was the third degree practiced on him which was mentioned in the history. He also described auditory hallucinations in which there was a voice in his cell which appeared to be that of God and which made him talk about airplanes. He stated this appeared to be present a couple of times since he has been in the hospital here, but he is apparently willing to accept the statement that such might be imagination. He states that when he was at Anamosa and working in the apron shop he became quite nervous, with loss of weight and loss of appetite: in fact, a general nervous condition, and that because of this he was transferred from that work to the floating gang with which he worked for about three weeks. This floating gang, from his description of it, evidently includes the insane who do not cause any particular disturbance because of their mental condition. They are used for general work about the yards.

"October 9, 1933. The patient has been getting along very well. His reaction has been normal since the last interview was made. The sheriff from Nobles County called for him yesterday afternoon. Physical condition: Good. Mental condition: Recovered.

"It is impossible to make a definite diagnosis in the case. There is some evidence that the patient might have had auditory hallucinations while he was in jail in Worthington. On the other hand, he deliberately simulated certain mental symptoms when

he was admitted. It is impossible to make a definite classification in this case. Consequently he will be placed under: #21 Undiagnosed psychosis."

On his return to Worthington the sheriff and the county attorney proposed to him to plead guilty and get a sentence of two years, or otherwise he would get seven years. He pleaded guilty to larceny of the horses and was sentenced to two years in the penitentiary at Stillwater, Minnesota. The date of his commitment does not appear in the record.

He was sent back from the prison at Stillwater to the state hospital at St. Peter and readmitted to that institution on July 3, 1934. The Physician's Clinical Report at the hospital on that date, giving the condition and conduct of the patient at the prison which caused him to be returned to St. Peter, states:

"The upset commenced gradually when the patient claimed that sewing machines had been brought here [Stillwater] from Anamosa, to tantalize him. The condition is increasing. He talks in a sullen, surly way and feels that gas is being shot into his cell. He has attempted suicide by hanging. He has been kept in a cell for about two months.

"July 13, 1934. The patient has been pleasant and co-operative since he was admitted to the hospital. He states that he had some difficulties in the prison and that he got into a fight with another inmate. For this reason he was locked up. He also admitted that he was depressed and attempted suicide. He states that they were pouring gas into his cell and that bothered him.

"October 13, 1934. The patient states that he was in the prison at Stillwater for ten months before coming here. He states that some of the 'guards or screws' put gas into his cell through the ventilator. He discussed that matter with inmates in the cells next to him. Both of them told him he was imagining these things but he cannot believe he was. He thinks that the deputy warden and possibly some of the guards had it in for him. He believes that the sheriff at Worthington told them in the prison how the patient was to be treated. He states he was double-crossed when he was sentenced, both the

last time and also the first time while he was in Iowa. He then stated that the bank robbery for which he was committed in Iowa and given a life sentence was a frame-up with the cashier of the bank. He says that the cashier of the bank was infatuated with the patient's wife and he thinks that this man was the father of the child. This cashier had been staying in his wife's home for two years before they were married. He believes that this man wanted the patient's wife and he thought probably the patient would be shot in the holdup. This cashier in the bank had discussed the matter with the patient for some time. They were supposed to get $8000 and the cashier was to have half of it. * * * During this interview a marked quivering of the muscles below the left eye was observed frequently. It was noted also that the patient had an 'iron-out' expression on his face. That is, there is practically no play of the facial muscles. This seemed more apparent today than it has at any other time, although it has been observed before.

"Further inquiries were made as to the patient's history and the following was elicited: While in the Reformatory at Anamosa he had diphtheria and following this influenza in 1925. After the influenza he had acute articular rheumatism. During the attack of influenza he had severe headaches. About a year after he had paralysis involving the left side of his face and the left arm. The paralysis was not complete but there was a marked weakness of the arm. A slight weakness of the left leg was also noted but this weakness was not as marked as of the arm. Following that he was unable to walk straight and he 'did not walk automatically but I had to think where to place my feet.' He said that his walk improved but that it was not normal when he was released from Anamosa. Preceding the attack of paralysis he said he had severe pains behind the left ear and excruciating headaches. * * * He states he would have frequent headaches commencing in the frontal area as a dull, pressing pain. After a short while it would extend up to the vortex and become rather sharp and lancinating. These headaches would last a varying length of time, some from four to six and up to ten and twelve hours. The patient also noticed after his attack of influenza that he did not sleep well.

He said he did not pay so much attention to it at the time. On further questioning it was found out that he had a tendency to doze off during the day and then would frequently have difficulty in sleeping at night. While at Worthington in jail he said he had severe headaches and does not think that he slept anything to speak of for about two weeks. In the prison he also had difficulty in sleeping.

"Here he has complained of headaches. These complaints have not been frequent but he said he had them a number of times when he did not mention them. He says he has had attacks of headaches every four or five days lasting a number of hours. They have always been of the same type described previously. There is a marked quivering at intervals of the muscles below the left eye. The facial expression is ironed-out. There is a marked coarse tremor of the fingers of the left hand. None was noted of the right. His walk is normal today but the attendant stated that at times the patient had complained some of difficulty in walking and his walk at times had been peculiar. The grip of the right hand was 160 and that of the left 96. The patient states that he has always been left-handed and he writes left-handed. Previous to that 'stroke of paralysis' his left hand was the stronger. He also states that he writes left-handed but he notices now that there are times he cannot write straight while at other times he writes fairly well.

"Considering the history elicited today, together with the findings, *there seems no question but that the patient had an attack of encephalitis in connection with the attack of influenza while he was in Anamosa. The acute attack might have been one when the paralysis was described or that might have been a flare-up of an earlier attack.* It is impossible to state definitely with the information at hand. *The mental reaction of the patient can well be explained in terms of chronic encephalitis.* There is a probability that the patient had a mild flare-up while he was in the jail at Worthington, and he might have had an exacerbation while in the prison. The symptoms of Parkinsonianism which are present at this time seem decidedly more marked than they have been at any time since he first came under the physician's observation. Based on these findings, a diagnosis is

made of: #8 Psychosis with other brain or nervous diseases (g) Chronic encephalitis."

On July 28, 1934, on the letterhead of the Iowa Board of Control of State Institutions at Des Moines, its secretary, F. R. Scholes, wrote the Director of the Department of Public Institutions at St. Paul, Minnesota, directing him to transfer Bruntlett from St. Peter State Hospital to the state of Iowa for care and treatment, and to deliver him before the commissioners of insanity of Page County, Clarinda, Iowa, for examination and commitment to the Clarinda State Hospital.

On his first commitment to the St. Peter Hospital he was there two months and twenty-four days and on his last commitment he was kept three months and six days, or a total confinement of six months.

He was admitted to the Clarinda State Hospital on October 15, 1934. In the report of that date it is stated:

"Opinion of Superintendent [Dr. R. D. Smith] as to condition at admission: Gives rather definite history of having suffered attack of acute encephalitis while at Anamosa Reformatory in 1926; has had three episodes of mental disturbance since that time and shows as a residual at the present time involvement, especially of the left side of the body, and impaired weakness, especially in the arm and flatness in the left side of face and abnormal stare, especially in left eye."

The report of Dr. Charles C. Obermann of same date, states: "He talks fairly frank about his case. He seems to have insight that he has an abnormal mental condition, the onset of which was after a stroke of paralysis in 1926."

In his report of November 12, 1934, Dr. Obermann reviews the mental history of the patient and refers to his various auditory hallucinations as noted in the St. Peter hospital records, and concludes with this statement: "There is ironing out of the facial expression, somewhat more so on the left and there is a stare, *similar to that seen in Chronic Encephalitis.*"

The letter of Dr. Norman D. Render, Superintendent of the Clarinda State Hospital, of December 26, 1947, to the Potta-

wattamie county attorney, enclosing the defendant's hospital records requested by the county attorney on December 22, 1947, states: "Our records show that he [Bruntlett] was discharged 'Not Cured' on parole, July 9, 1935." The copy of the Clarinda hospital record states that Bruntlett was "Discharged Not Cured on Parole, July 9, 1935, by sentence to Fort Madison." This is the only mention in the record before us of defendant being "sentenced" or transferred by the Board of Control to the penitentiary at Fort Madison, if it did, in fact, take place.

There is nothing in the record about the defendant during the years just preceding the homicide, except that he was again married and had three children at that time; that he was farming in that vicinity and had a small amount of property, whether by his own efforts or by inheritance does not appear.

The Anamosa records concerning him were before the trial court but are not a part of the record on appeal.

It appears from the records of each of the state hospitals in which he was kept for a total of fifteen months or more that it was the conclusion of those in charge of those institutions that the defendant had suffered an attack of acute encephalitis, as a sequence of his illness from diphtheria and influenza while at Anamosa, which had progressed to the third or chronic, permanent stage of encephalitis when he was discharged from St. Peter State Hospital and admitted to the Clarinda State Hospital. It is true, as stressed by the district court and his custodians at Worthington, that he was thought to be putting on an exhibition of insanity, and he admitted that he followed the advice of attendants in refusing to talk, but Drs. Harrison and Mork, apparently of the Nobles County Board of Insanity, after a period of observation and examination were satisfied that there was some mental derangement. That Board then committed him to the St. Peter State Hospital, where the doctors reached the same conclusion. The doctors at the Stillwater prison reached a like conclusion, and returned him to St. Peter.

He was delivered to the commission of insanity of Page County, Iowa, and was by it committed to the state hospital at Clarinda. The superintendent and the doctors of that institution reached the same conclusion as to the mental and nervous

disease which afflicted defendant, and the cause of it. It was their conclusion that he was afflicted with chronic encephalitis.

There is nothing of record in the trial below, and, necessarily, nothing before this court of the cause, nature or effects of encephalitis. No doctor gave any opinion or report on the matters. There is little mention of them in the findings or conclusions of the trial court. In an appeal of this kind the duty and power of this court is limited to the correction of errors. I am not a psychiatric diagnostician and express no conclusions as such. But when the record shows by the overwhelming judgment of those qualified, and after months of observation and examination by them, that the defendant when last examined by them had reached the chronic and permanent stage of a progressive mental disease, I felt it my duty to inform myself. I have consulted no psychiatrist but examined some standard treatises on mental and nervous diseases which I had collected as a practicing lawyer.

I. From them I have collected the following data. They describe encephalitis as a disease of the brain. The name is from two Greek words, "encephalon" meaning the brain, and "itis" meaning inflammation. It is an inflammation of the brain—of the brain substance. The condition may arise from a bacterial, toxic, infectious malady known as "epidemic encephalitis" or it may, and often does, appear as a result or after-effect of a severe attack of influenza, diphtheria, typhoid fever, scarlet fever, measles, malaria, and other diseases. The physical effect on the brain varies. It may be hemorrhagic or purulent (pus-forming). It attacks any and all parts of the brain and impairs their functioning.

Three principal stages are recognizable: (1) an acute stage (2) a post-acute, and (3) a chronic. In "Diseases of the Nervous System, by Jellife and White, 4th Ed. 691, is this statement— all the words are plainly defined in Webster's or any medical dictionary:

"Mental changes are too numerous to catalogue. These may be distinguished as: (a) Early changes; (b) during the illness; (c) after the illness and (d) residuals. The early stages resemble those of a toxic infectious delirium with confusion and dis-

orientation. Later the picture may continue and show atypical catatonic (stuporous), hebephrenic (dementia precox), or paranoid-like syndromes (signs and symptoms). Acute maniacal states are met with. Defect states develope, or prolonged anxiety syndromes, with myotonic (spasmatic) features in the muscles, remain for long periods. Criminal acts may be performed which are of considerable medico-legal significance."

In Cecil's "Text-Book of Medicine", contributed to by scores of eminent American doctors, pages 325, 326, are these statements:

"No age is exempt. Incidence appears to be greatest, however, between twenty-five and forty-five years of age. * * * Emotional disturbances are common and tend to be persistent. In some cases marked mental deterioration occurs and may be mistaken for general paresis. Manic and melancholic states (manic-depressive insanity) have been observed, and less often a condition simulating dementia praecox has been seen." This quotation is in a discussion of the first stage of the disease. Concerning the second stage (page 329) is this: "Of those who survive the acute stage of the illness (four to eight weeks), many develope a progressive disease of the central nervous system. Persistent insomnias, mental impairment, psychoneurotic states, tremors, irregular involuntary movements, * * * oddities of behavior, and Parkinson-like (palsy) syndromes are common * * *. [Page 330.] A prolonged period of rest after the acute stage is over may do much to prevent the development of the much-dreaded third stage. * * * Patients with severe psychotic symptoms or exhibiting anomalies of behavior may have to be cared for, temporarily or permanently, in a closed institution."

Of the third stage, or chronic encephalitis, which was the diagnosis of defendant at the state hospital at St. Peter, when he was sent to Clarinda in October 1934, and the diagnosis of those in charge at the Clarinda State Hospital on his admission there, Church and Peterson in their work on Nervous and Mental Diseases, 5th Ed. 237, say:

"Chronic cerebritis, and chronic encephalitis are terms loosely applied to late and usually secondary conditions that

are mainly sclerotic and degenerative in nature. This sclerosis may exist in disseminated patches or in large, circumscribed areas; it may involve an entire hemisphere or be largely confined to the gray matter of both half-brains. The portion of the encephalon thus affected is disturbed in its function, which is usually greatly impaired or entirely abolished."

In the diagnosis of chronic encephalitis, made at St. Peter on October 13, 1934, it is mentioned that "symptoms of Parkinsonianism were present." In speaking of the expressionless appearance of the face and the immobility of the facial muscles, it is said in Taber's Cyclopedic Medical Dictionary, page 24, that they are typical symptoms of postencephalitic stages.

According to these treatises this brain disease and inflammation may and does attack any and all parts of the brain— those which direct bodily movements, and those which are the seat of reason, judgment and will power. The paralysis denotes some impairment of the motor centers. His auditory hallucinations, his persecutory delusions, characteristic of paranoia, and his homicidal tendencies are symptomatic of cerebral derangement.

II.  The majority opinion mentions the failure of the court to appoint an experienced lawyer to take charge of Bruntlett's defense, and the need of such an appointment. The lawyer appointed was twenty-five years old, was graduated from law school in 1945 and admitted to practice during that year. He was appointed by the district court on January 27, 1948. The trial had been set for February 3, 1948. Though new in the practice, yet like an able and experienced lawyer would have done, he promptly, on January 29, 1948, filed a motion for a continuance of the trial "to the next regular term of this court, or to such other time as will permit defendant and his counsel to adequately prepare for the trial of this cause." The reasons alleged for the relief were sound. In substance they were (1) the attorney was appointed by order of the court during the midafternoon of January 27, 1948 (2) at that time he and defendant were entirely unknown to each other and had not conferred about the case (3) the action is a matter of serious importance to the defendant and to the State, one requiring a

large amount of research in law and legal precedents; and requiring a vast amount of time investigating the various aspects of the case and the persons involved, and interviewing witnesses (4) the previous order of the court set the trial for February 3, 1948; the defendant is in jail without bail and interviews with him are difficult; defendant and his attorney feel that without further and complete investigation of legal authority and precedents and without more time to interview witnesses and possible witnesses that a complete trial of this case cannot be had; and that it is to the interest of this defendant and to the State of Iowa in the impartial and fair conduct of its trials to permit further time to the defendant and his attorney to properly prepare a defense in this action, in order that the full and complete exposition of all facts and matters may be presented to an impartial jury.

I find no resistance in the record on the part of the State to this motion. It was denied by the court. The ablest trial lawyer would have asked for and needed time to adequately prepare the defense. The ruling was unfair to the defendant and unfair to his lawyer.

As said by Justice Richards, in a dissent concurred in by Justice Mitchell, in State v. Breeding, 220 Iowa 605, 610 et seq., 262 N. W. 467, 470, an appeal from a death sentence on a plea of guilty where the appointed attorney was denied adequate time:

"The defendant was entitled to defense by counsel. Code section 13773. This the defendant did not have, in any substantial sense, by reason of the casual and summary fashion of the proceedings themselves. The degree of the offense, and the existence or lack of extenuating facts or circumstances, as determining the punishment to be adjudged, were issues the court set out to determine in these proceedings. Code section 12913. With his life at stake, thorough investigation and careful preparation and presentation of the facts and law involved in these issues, by counsel, was defendant's right. Such investigation and preparation were in fact the most essential elements of defendant's right to defense by counsel."

The able dissent and the case of Powell v. Alabama, 287

U. S. 45, 53 S. Ct. 55, 59, 77 L. Ed. 158, 84 A. L. R. 527, quoted therein stress the fact that defense by appointed counsel should be something more than pro forma. In State v. Junkins, 147 Iowa 588, 591, 126 N. W. 689, 690, the crime, more atrocious than in this case, committed by a degenerate, still further degraded by intoxicants and drugs, every procedural protection was afforded the defendant. A change of venue was granted. Nearly four months intervened before trial. "He was defended by [four] distinguished, able, and experienced lawyers." This court said through Justice Weaver:

"There may be times of great popular excitement when the all-pervading atmosphere of prejudice and passion penetrates the inmost chambers of the temple of justice, rendering a fair trial difficult if not impossible. Ordinarily, however, it is within the power of the court, by granting change of venue or by temporary postponement, to insure a trial in which the issues will be fairly considered upon their merits."

The sentence of death was affirmed but there was no basis for complaint with respect to the procedure.

III. On January 10, 1948, defendant, in custody, appeared in district court with his attorney, Hugh P. Finerty, and entered his plea of not guilty. So far as the record shows, Mr. Finerty did not thereafter appear in the case. On February 3, 1948, the defendant with his court-appointed attorney appeared in court and changed his previous plea of not guilty to one of guilty. There was then no need, nor offer, of evidence to sustain the indictment. Up to that point in the proceedings the defendant was presumed to be sane. He had made no plea of any kind that he was insane, as a defense to the indictment.

Section 783.1 of the Code of 1946 provides: "Doubt as to sanity—procedure. If a defendant appears in any stage of the trial of a criminal prosecution, and a reasonable doubt arises as to his sanity, further proceedings must be suspended and a trial had upon that question."

The defendant did not attempt to procure the suspension of proceedings and a trial under said section.

When the defendant has been convicted of, or pleaded guilty

to, a criminal charge, section 789.8, Code of 1946, provides: "If the court is of opinion that there is reasonable ground for believing him insane, *the question of his insanity shall be determined as provided in this code,* and if he is found to be insane, such proceedings shall be had as are herein directed." (Italics added.)

The reasonable interpretation of the italicized words is that the question of insanity shall be determined as provided in chapter 783 of the 1946 Code.

Under sections 690.2 and 690.5 of the 1946 Code, when a defendant pleads guilty of murder in the first degree, it is provided in each section that the court must determine whether the penalty be death or imprisonment for life. While section 690.4 provides that on a plea of guilty under an indictment for murder "the court must, by the examination of witnesses, determine the degree." It is stated in State v. Harper, 220 Iowa 515, 521, 522, 258 N. W. 886, that some conflict in section 12913, Code of 1935 (690.4, Code of 1946) and section 12914, Code of 1935 (690.5, Code of 1946) is apparent, but that the latter section, having been enacted later, controls in the event of a conflict. This court in that case—in which there was no question of insanity—held that where defendant had pleaded guilty to murder in the first degree, the only duty on the court was to fix the penalty, and for that purpose no hearing or examination of witnesses was necessary to inform the court. The court followed State v. Hortman, 122 Iowa 104, 108, 97 N. W. 981.

Upon the plea of guilty on February 3, 1948, the court stated that there would be a recess until the next morning at which time the State and defendant would be permitted to make such showing to the court as each might deem proper for the purpose of assisting the court in determining the punishment and the degree of murder to be adjudged against the defendant. The State had several weeks for preparation, and the defendant but little. One continuance had been denied him and he did not ask for another. Under State v. Harper, supra, the court was not required under either Code section 690.4 or 690.5 to have any hearing, either on the degree or on the penalty. But such hearing was had and the State called ten or more witnesses

who testified to the homicide and to the conduct of defendant before and after this event. The State also introduced Exhibits 17 and 18, being sound-scriber recordings of interviews of defendant by the county attorney and Max Studer, special agent of the Iowa Criminal Bureau of Investigation; Exhibit 43, the written report of Drs. Ash and Mahoney of their examination of defendant; and Exhibit 42, being copies of the clinical reports on defendant from the hospitals for the insane at St. Peter and Clarinda. Exhibits 42 and 43 were received by the district court and considered by it, as stated in its findings and judgment.

These exhibits, herein set out, fairly and fully establish that defendant was duly adjudicated insane and a proper subject for treatment in the state hospital at St. Peter by the Board of Insanity of Nobles County, Minnesota, and by it committed to said hospital, and that he was thereafter recommitted to the hospital by those in charge of the Stillwater prison, and that he was never discharged by said hospital as cured or sane, but was found to be afflicted with chronic encephalitis and transferred in that condition to the commission of insanity, Page County, Iowa, by order of the Iowa Board of Control. The exhibit also establishes that defendant was duly adjudicated as insane and a fit subject for treatment in the state hospital at Clarinda, Iowa, and so committed, and that he has never been discharged as cured or sane, but was discharged on parole and expressly as "Not Cured."

The county attorney received the records (hospital) in the last days of December 1947. They were received in evidence in the hearing before the court on February 4, 1948, and the court was apprised of their contents and the adjudication of defendant's insanity and of his being an inmate in hospitals for the insane for fifteen months, and of his being paroled as not cured or recovered. In this state of the record there was no presumption of the defendant's sanity. He was shown to have been afflicted with a progressive mental disease in its chronic and permanent stage. Proof of an adjudication by a county commission of insanity of such insanity, and commitment to, and incarceration in, a hospital or institution for the insane, and

that he had never been discharged as cured or recovered, is prima facie evidence of his continuing insanity.

In Bettenga v. Stewart, 214 Iowa 1284, 1285–1287, 244 N. W. 279, 280, a habeas corpus action, there was such an adjudication and commitment. The court said:

"The plaintiff having been legally declared insane * * * and a fit subject for treatment at the hospital, such condition is presumed to continue and to exist at the time of the hearing of this matter in the district court, and establishes *prima facie* that he was insane at the time this proceeding was being heard, and the burden is upon him to show restoration to sanity by competent and sufficient evidence."

Other decisions holding that when insanity is once established it will be presumed to continue until the contrary is shown, and the burden is then cast upon the one who asserts a return to sanity to establish it by competent and sufficient evidence are Carr v. Carr, 209 Iowa 160–165, 225 N. W. 948; Hazen v. Donahoe, 208 Iowa 582–585, 226 N. W. 33; Tiffany v. Tiffany, 84 Iowa 122, 50 N. W. 554; Weber v. Chicago, R. I. & P. R. Co., 175 Iowa 358, 382, 383, 151 N. W. 852, L. R. A. 1918A 626; In re Estate of Ost, 211 Iowa 1085, 1089, 235 N. W. 70; Madsen v. Obermann, 237 Iowa 461, 472, 473, 22 N. W. 2d 350; In re Will of Knox, 123 Iowa 24, 30, 31, 98 N. W. 468; Mileham v. Montagne, 148 Iowa 476, 481, 482, 125 N. W. 664.

It is true that the presumption is not conclusive, but only prima facie, and the remoteness of the adjudication may lessen the presumption in certain cases, but that is not true where the mental derangement had at the time of the adjudication reached a chronic and settled unsoundness. See Jones v. Schaffner, 193 Iowa 1262, 1272–1275, 188 N. W. 787; Waters v. Waters, 201 Iowa 586–592, 207 N. W. 598.

The conclusions of the doctors and superintendents of the two hospitals that he had chronic encephalitis, a mental disease and brain impairment often accompanied by, or inducing, dementia praecox, now commonly called schizophrenia, manic-depressive insanity, and paranoia, are supported by the fact findings of those doctors that he had homicidal tendencies with re-

spect to himself and others, auditory hallucinations, and delusions that others were hostile to, and persecuting, him.

In opposition to this evidence there was offered by the State at the hearing on February 4, just the written report of Dr. Ash and Dr. Mahoney. I speak not in criticism of them nor of their honesty and ability. But their examination was of necessity a limited one. At four o'clock in the afternoon they began the examination and apparently completed it. A physical examination might have disclosed little, but apparently they gave him none. He told them something of his life. He gave no evidence of loss of memory. He was properly oriented as to person, place and time, that is he knew who he was, where he was, and what time it was. He said he had been married for five years and had three children, and had no domestic troubles. They report that he "presented no particular paranoid ideas and did not demonstrate any delusions or hallucinations." One familiar with the numerous cases that have come to this court and other courts knows that the mentally deranged do not continuously keep their insane characteristics on display. As said in Bettenga v. Stewart, supra, 214 Iowa 1284, 1286, 244 N. W. 279, 280, speaking of one with paranoid tendencies: "* * * he does not recover; it is probably the most dangerous type of insanity * * * [he] has persecutory delusions, but the mind is clear on all other subjects." The conclusion of the two doctors was that "there does not seem to be any evidence of his having a recent psychosis since his discharge from the Clarinda State Hospital." The reports from the hospitals for the insane had not been received at the time of the examination, but the doctors may have seen them by December 30, 1947, when the report was mailed to the county attorney.

Exhibits 17 and 18 are the recording of interviews between the defendant and Mr. Jackson, the county attorney, and Mr. Studer. They disclose no evidence of any unfair or "third degree" methods on the part of either gentleman. The exhibits are not very helpful for either side. They do show that defendant spoke of "urges" which he tried to fight off, but could not resist.

"Mr. Jackson: Let me ask you this, Corliss—when you shot Smith, do you think you knew what you were doing then?

"Mr. Bruntlett: No, I don't.

"Mr. Jackson: Do you think this urge had got ahold of you to the point where you couldn't control yourself?

"Mr. Bruntlett: That's right—exactly.

"Mr. Jackson: What about when you burned the body? Did you still have that urge then—or was that just something that you knew you had to dispose of this evidence?

"Mr. Bruntlett: Why—I must have an urge there or something—it's just too deep for me."

Some of Bruntlett's answers are noted as "answers unintelligible."

In my judgment the evidence offered by the State was not of that probative force, weight, competency and sufficiency to overcome the presumption of insanity established by Exhibit 42. It may be true, and I am of that opinion, that under Code sections 690.2, 690.4, 690.5, and under section 789.8, a discretion is lodged in the district court, but, as always, it is a sound, judicial discretion, and not arbitrary or conclusive. It seems to me that when, under the record, a defendant under indictment appears for judgment, presumably insane, the court should recognize and regard that presumption, and it should generate in the court a reasonable doubt of his sanity, and furnish reasonable ground for thinking him insane. In the latter event the question of defendant's insanity at that time should be determined by a jury as provided in chapter 783 of the Code.

The trial court stresses the heavy responsibility and duty imposed upon it by the statutes, and mentions that the legislature has seen fit to retain capital punishment as a penalty. There is an equally heavy responsibility and duty on every member of this court. The legislature has not made capital punishment arbitrary or exclusive. It has not taken away from the courts, judges and jurors or other executive officers the exercise of a sound, judicial discretion under the facts and the law. Capital punishment is one of the penalties for murder in the first degree. The other is imprisonment for life at hard labor in the penitentiary.

The legislature has defined the crimes and it has determined the penalties for their commission. It has also enacted laws to

safeguard the rights of those charged with, or convicted of, crimes. Speaking of such statutes, Justice Weaver, in his able dissenting protest against the death penalty in State v. Olander, 193 Iowa 1379, 1386, 186 N. W. 53, 56, 29 A. L. R. 306, Olander v. Hollowell, 262 U. S. 731, 43 S. Ct. 699, 67 L. Ed. 1205, said:

"All these provisions are concessions to the evident truth that rules prescribing the nature and kind of punishment to be imposed for specific offenses must have some degree of flexibility, not alone in the interest of persons accused or convicted, but in the public interest as well." One further quotation from said opinion, page 1385: "Realizing that, even in the realm of crime, there are degrees and grades of turpitude, and that to assess the same dead level of penalty upon every person convicted of violating the same statute, without reference to extrinsic circumstances, would be often to perpetrate glaring injustice, our lawmakers have sought to introduce some reasonable degree of elasticity into the scheme of legal retribution."

Code section 789.8 is one of those safeguarding statutes. It provides for an inquisition as to the insanity of the convicted defendant, even as he stands before the bar to receive the sentence. It is a remedial statute, and as such should be liberally and reasonably construed to effect its object. In the great majority of instances the defendant is sane and the matters which weigh with the judge in determining the nature or extent of the sentence are such as any person of ordinary judgment and intelligence might soundly pass upon. The statute reads: "If *the court is of opinion that* there is reasonable ground for believing him insane." In my judgment this means no more nor less than if the italicized words were omitted. For, certainly, if the "reasonable ground" exists, that should determine the question. The legislature must have intended that, before a court denied a defendant the protection of the statute, it must be very, very sure that no reasonable ground existed as to his insanity. We must assume that legislators take a realistic and a sound and sensible attitude in their functioning as lawmakers. They know that judges are not psychiatrists and it could not have been the legislative intention that judges should assume that capacity and function. It certainly was never intended

by the legislature that a judge, in order to erase any reasonable doubt as to a defendant's sanity or to confirm an opinion that there was no reasonable ground for believing him insane should search the books of psychiatry and mental diseases to find a solution.

The district court in its judgment entry of February 9, 1948, stated:

"In cases where psychosis post encephalitis exists and crime has been committed, there is no premeditation in advance of the crime and there is no cover-up or attempt to avoid the consequences afterward. Humans suffering with psychosis post encephalitis when they do commit crime do so on the spur of the moment and act entirely upon impulse. From the facts in this case * * * *the court must exclude even the possibility, let alone the probability,* that this defendant was suffering from psychosis post encephalitis on the 8th day of December, 1947.

"This court *not being satisfied* by merely excluding the possibility of psychosis post encephalitis affecting the mind or *possibly so,* has made further investigation into the *possibilities* of the defendant suffering from schizophrenia paranoia. The word 'schizophrenia' is a technical medical term and means, in common parlance, 'split mind', 'schizo' meaning split, 'phrenia' meaning mind. *After a thorough investigation and study of this particular type of insanity,* this court can conclude but *one thing* and that is that one suffering from schizophrenia paranoia builds up a resentment over a protracted period of time; in some cases a resentment to law enforcement or resentment to officers of the law. Some develop a hatred for a certain individual or individuals and develop the idea that it is necessary to destroy other humans for their own self-preservation and protection. This type of insanity does premeditate and plan and sometimes they may and other times they may not remember the crime or the transactions that took place at the time of the crime. However, a person suffering from this type of insanity feels that his acts are righteous, that he has accomplished his purpose, which is a righteous purpose. He has no remorse afterwards, but is elated by his accomplishment. The facts in this case *completely and utterly exclude* that this de-

fendant was suffering from schizophrenia paranoia on December 8, 1947.

*"This court still being unsatisfied, and desiring to pursue every course to avoid even the possibility of error in this decision, has investigated still further the possibility of the defendant having a psychopathic personality with psychosis.* A human being suffering from this mental disease we find usually, if not entirely, develops in childhood. First we see this type of patient as a juvenile delinquent, gradually develops and gets worse, commits more crime, each time blaming others for his downfall and failures, but still continuing in the same direction and eventually commits a major crime. The facts in this case do not justify the finding this defendant is suffering with a psychopathic personality with psychosis. * * * In other words, the court cannot reconcile the defendant's acts and his statements with *any form of psychosis.* The court wishes it could.

"In spite of the history of any previous mental breakdown or in anticipation of any *possible mental breakdown* in the future, there is no reason *to suppose, assume or believe* that the defendant was not sane and in a responsible condition of mind at the time of the commission of this crime on December 8, 1947 *or at any particular time since that date."* (The italics are supplied.)

The district court has spoken with finality.
In 1 Burdick's Law of Crime (1946) 267, 268, he states:

"Insanity is a mental disease, and in the medical profession the recognized types or forms of insanity or mental unsoundness are many, and the possible varying phases of these forms in individual cases are *endless.* Indeed, no single brief but comprehensive definition of insanity could be framed that would apply to all cases. *So subtle and indefinable is the human mind in its operations, and so imperceptible the dividing line between sanity and insanity, that even the medical experts in criminal cases often disagree in opinion concerning the sanity or insanity of a defendant."* (Italics added.)

In Dr. Henry Maudsley's excellent work, "Responsibility in Mental Disease", pages 38, 40, it is stated:

"It would certainly be vastly convenient, and would save a world of trouble, if it were possible to draw a hard and fast line, and to declare that all persons who were on one side of it must be sane and all persons who were on the other side of it must be insane. But a very little consideration will show how vain it is to attempt to make such a division. That nature makes no leaps, but passes from one complexion to its opposite by gradations so gentle that one shades imperceptibly into another, and no one can fix positively the point of transition, is a sufficiently trite expression. Nowhere is this more true than in respect of sanity and insanity; it is unavoidable therefore that doubts, disputes and perplexities should arise in dealing with particular cases. * * * It is of great importance then to recognize a borderland between sanity and insanity, and of greater importance still, not resting content with a mere theoretical recognition of it, to study carefully the doubtful cases with which it is peopled. * * * [page 78] Insanity being a disease which *cannot exist apart* from disorder of bodily organs and functions, the diagnosis of it must belong to the physician; for he alone is competent to investigate and appreciate these disorders. Those who would take from him the diagnosis might as well claim to take the treatment of the disease."

That there was doubt and uncertainty implicit in said section 789.8 in the mind and conscience of the trial court is clearly evident from its intensive and persistent effort to remove that doubt and uncertainty and reach a certainty that was beyond "even the possibility of error."

The uncertainty and reasonable doubt and ground being in existence, the demand of the statute required a trial of the issue as provided therein. Such a demand is not satisfied or performed by an inquisition of the trial court. We have said in some cases —State v. Arnold, 12 Iowa 479, 483, State v. Hortman, supra, 122 Iowa 104, 109, 97 N. W. 981, and State v. Harper, supra, 220 Iowa 515, 523, 258 N. W. 886—that the trial court may act upon any information from any source which satisfies its conscience and sense of duty, but I find no such judicial interpretation of section 789.8. Since an appeal is allowed challenging the character or extent of the sentence alone, there should

be such a record made below that an adequate review may be made in this court, and the defendant should be advised of the facts on which the trial court acts.

The majority opinion states "if there is justification for clemency that is a matter for executive action" and also "if there is any doubt as to the appellant's present mental condition a statutory provision is provided for determining that fact. Section 792.5, 1946 Code." The cited section provides that when the warden of the penitentiary is satisfied there are reasonable grounds for believing that a defendant in his charge under sentence of death is insane, he shall notify the commissioners of insanity of the county wherein the penitentiary is located, who shall make proper inquisition in the matter.

The matters referred to should be given no consideration by this court. It has a duty, wholly its own to perform. It cannot be properly performed by shirking and shifting that duty upon the Governor of the State or upon the Warden of the Penitentiary.

The majority opinion also states that "it must be kept in mind that the appellant at no time pleaded as a defense that he was insane at the time of the commission of the crime", and that he did not proceed under section 783.1, supra. That is true, but this failure, in my opinion, does not release the court if the reasonable doubt does, or should appear to him. And under section 789.8 the burden is clearly on the court.

By section 793.18, Code of 1946, a grave responsibility is placed on this court in appeals by the defendant in criminal cases. Under it "* * * the supreme court *must* examine the record, *without regard to technical errors* or defects which do not affect the substantial rights of the parties, *and render such judgment on the record as the law demands;* it may affirm, reverse, or modify the judgment, *or render such judgment as the district court should have done,* or order a new trial, *or reduce the punishment, but cannot increase it."* (Italics added.)

Of that section in Justice Weaver's dissent in State v. Olander, supra, 193 Iowa 1379, 1386, 1387, 186 N. W. 53, 56, 29 A. L. R. 306, it is stated:

"By this provision the court of last resort, viewing the case

in the light of the entire record, free from the pressure and distraction inseparable from the trial of criminal offenses of a grave character, is clothed with broad and comprehensive power to control, within statutory limits, the imposition of the penalties of the broken law. * * * The authority to modify or to reduce the punishment is not dependent upon the finding of any error in the rulings of the trial court. The record may be entirely free from error, and the guilt of the defendant may be admitted or confessed or otherwise shown beyond reasonable doubt; and yet the circumstances may be such as to fairly indicate that effective administration of justice will be subserved and sounder public policy promoted by modifying the harshness of the punishment; and in such case, it is not only within the right and power of the court, but becomes its duty, to exercise that power by ordering such modification as, in its impartial discretion, it believes the case requires. In the face of such responsibility, we have no right to shift the burden from our own shoulders to those of the executive."

See also State v. Barr, 123 Iowa 139, 142, 143, 98 N. W. 595. We have many times exercised our power under said section and its predecessors. State v. Madden, 35 Iowa 511; State v. Thompson, 46 Iowa 699, 700; State v. Hayden, 45 Iowa 11, 18; State v. Rogers, 156 Iowa 570, 573–575, 137 N. W. 819; State v. Doering, 48 Iowa 650–652; State v. Moody, 50 Iowa 443, 445, 446; State v. Fields, 70 Iowa 196–198, 30 N. W. 480, however, in the last case the indictment did not specifically charge the crime.

It has been said (State v. Smith, 127 Iowa 528, 103 N. W. 769; State v. Olander, supra, 193 Iowa 1379, 186 N. W. 53, 29 A. L. R. 306) that this court has no power to pardon, or to commute the sentence. This may be true in the technical sense of those words, but under the plain language of the section just quoted and the broad powers therein given, this court has the right within limitations to substitute for one penalty a lighter one, which is commuting, and, in effect, a pardon in part.

The State's brief quotes at length from the concurring opinion, which is the opinion of the court, in State v. Olander,

supra, 193 Iowa 1379, 1390, 1391, which states: "I think the statutory sword of Damocles above his head should be hung by a more slender thread, and that the terror thereof should be increased, rather than lightened." There was no issue of insanity in that case. The doctrine is the ancient one of so putting malefactors *in terrorem* by the severity of the penalty that they would restrain themselves from the commission of crime. Its efficacy has been questioned. At the end of the Eighteenth Century capital punishment was the penalty for more than one hundred and sixty crimes. IV Blackstone's Commentaries (1769) Second Ed. 18. In those days the convicted were often beheaded or drawn and quartered. Today in England but few crimes draw the penalty of death, and it is very rarely exacted. Certainly hanging a madman will not deter other madmen from crime, nor perhaps, sane men. The object of all penal punishment is to prevent crime, with the hope that reformation may also be effected. I am expressing no ideas on what the penalties for murder in the first degree should be. The legislature has spoken.

I agree with the majority opinion that the case was one requiring an experienced defending attorney. But the errors of which I complain were not chargeable to him. His motion for sufficient time to prepare for trial was good. It should have been granted. The court abused its discretion in denying the motion. The time remaining before trial was too limited even for investigation adequate to enable defendant and his attorney to determine advisedly with respect to defendant's plea. He had pleaded not guilty. This plea was withdrawn and defendant then pleaded guilty as charged. Judgment was entered accordingly, and defendant was sentenced to be hanged. Defendant does not assign error upon the denial of the continuance. The error chiefly relied on for reversal is the imposition of the sentence to hang, rather than the sentence of imprisonment.

The defendant should not be hanged if he is insane. I do not know whether he is sane or insane. But I am very certain that there was sufficient evidence presented to the court in the hearing before it after the plea of guilty to furnish reasonable ground for believing him insane. The bulk of this evidence

was gathered and submitted to the trial court by a conscientious county attorney seeking the facts. He secured the records from the hospitals for the insane. Defendant's attorney had neither the time nor the opportunity. This evidence established that defendant had been committed to two hospitals for the insane by two different commissions of insanity. The first commitment was to the St. Peter, Minnesota, hospital, and, after incarceration therein for three months, he was sentenced on a criminal charge to the Stillwater prison for two years. After being kept there for ten months he was recommitted to the St. Peter hospital where he was kept three months more. The psychiatrists at that hospital diagnosed the defendant as a chronic encephalitic. On an order from the Iowa Board of Control he was transferred to the Page County, Iowa, Commission of Insanity, which committed him to the Clarinda State Hospital for the insane where he was kept for nine months, and discharged as not cured. It was the conclusion of those in charge of the Clarinda State Hospital that defendant was afflicted with chronic encephalitis. The doctors at these institutions all agreed as to the nature of his mental derangement. The records from St. Peter hospital stated that he had auditory hallucinations, persecutory delusions, homicidal and suicidal tendencies—he attempted suicide at Stillwater prison. All of this evidence is in the record without dispute. It was presented to the court on February 4, 1948. He was sentenced on February 9, 1948.

The evidence was sufficient to raise a fair question as to the defendant's sanity, to raise a reasonable doubt of his sanity, and to furnish reasonable ground for believing him insane. To say simply that one believes is not enough. For a district court to say so is not necessarily conclusive on this court. A belief is an opinion. The strength and worth of each depends upon the foundation on which it rests. There being sufficient basis for reasonable ground to believe the defendant insane the court should have followed the mandate of Code section 789.8, to wit, "the question of his insanity *shall be determined* as provided in this code", that is, by a jury. Instead the court set itself up as a tribunal to determine the very fact of his sanity

or insanity. In doing so the court, in my judgment, seriously erred to the prejudice of the defendant.

In a number of cases in the past the question like the one now before the court—the reduction of a sentence to hang to that of imprisonment for life, on the ground of insanity—has been presented to this court. Among them I find no case where the record which came to us pointed more clearly to mental derangement than does the instant one. Certainly the claim of sanity here is not one first raised after the commission of the crime charged. There was definite evidence of the impaired mind of the defendant long before that time. Prima facie that impairment still exists. Code section 789.8 was enacted for the protection of one whose sanity is fairly and reasonably open to question. Certainly such a person ought not be hanged without being granted the benefit of its provisions.

Defendant's sanity or insanity at the time of his sentence should have been determined by the tribunal required under said section and by procedure provided in the Code, with full opportunity to present witnesses, both lay and expert, on said issue.

I would reverse the judgment of the district court for that purpose.

OLIVER and GARFIELD, JJ., join in this dissent.