STATE OF IOWA, Appellee, v. W. C. OLANDER, Appellant.

**HOMICIDE:** Reduction of Death Sentence. The appellate court will not reduce a sentence in a criminal cause unless some *legal* reason therefor is made to appear, i. e., the imposition of an excessive sentence—one out of all proportion to the degree of guilt. Record reviewed, relative to a murder committed in the perpetration of a

robbery, and *held* that the sentence of death should stand, inasmuch as no legal reason was made to appear to the contrary.

WEAVER, J., dissents.

*Appeal from Webster District Court.*—G. D. THOMPSON, Judge.

JANUARY 17, 1922.

REHEARING DENIED JUNE 23, 1922.

THE defendant pleaded guilty to murder in the first degree, and was sentenced to be hanged August 11, 1922. He appeals.— *Affirmed.*

*Healy & Breen,* for appellant.

*B. J. Gibson,* Attorney General, *B. J. Flick,* Assistant Attorney General, and *V. E. Gabrielson,* County Attorney, for appellee.

PRESTON, J.—All the evidence, and everything that was said and done in this matter in the district court, was taken down by the reporter. The court carefully guarded every right of the defendant. This is conceded. There is no error in the record, unless it be that the penalty of death is excessive.

The deceased, Halfpap, an honorable citizen, while engaged with his duties as a merchant, was killed by a shot from a revolver, held in the hands of this defendant, while he and two confederates, Otis Goble and Elmer Sweeny, were perpetrating a robbery. At the time of the hearing herein, Goble and Sweeny had not been tried. There is no doubt whatever of defendant's guilt. This is conceded. His counsel state that for defendant's crimes of robbery and murder they offer no excuse, tender no apology, and proffer no extenuation. It is shown by the evidence, and conceded by the defendant, that he had been engaged in similar enterprises of robbery with the other two, sometimes one and sometimes another holding the revolver. His counsel concede that he is a highwayman and a bandit. He deserves severe punishment. The defendant is 28 years of age. When he was quite young, his father deserted his mother and the

family. When defendant was about 15 years of age, he stole some property of small value, and was sent to the Industrial School at Eldora, where he remained for two or three years. When paroled from that institution, he went to work in light and power plants at different places. He married, and has three young children. He went to work in the gypsum mills at Fort Dodge. When the mills closed down, he was out of employment. He claims to be now penitent, and while confined in jail, wrote a letter to the widow of his victim, with the hope, perhaps, that this and his plea of guilty would operate to his advantage. The deceased had a wife and four children. While deceased was being robbed, he resisted. It is claimed by appellant's counsel that the killing was not premeditated or planned. It appears, however, that the robbery was planned in advance. The defendant himself so states. He was armed, and was prepared and willing to kill, if it became necessary. The statute makes a killing under such circumstances murder in the first degree.

In an earnest, touching appeal by his counsel, we are asked to be merciful—to save the life of the defendant. For myself, and I am sure I express the sentiments of my associates, I feel the great responsibility. The State asks that the extreme penalty inflicted be sustained, for its deterring effect upon others similarly inclined, and for the protection of society. We are asked by appellant to be merciful, where he showed no mercy to his victim and his victim's family. We are asked to give greater consideration to the defendant's family than he himself gave them. It is urged by counsel for appellant that the law providing for or permitting capital punishment does not have the deterring effect intended and expected by its passage. With the question whether the law is wise or not, we have nothing to do.

Counsel for appellant state that they "believe the sentence of death should be commuted to life imprisonment. That is all there is to this appeal." They contend that the judgment is excessive, not alone because of the matters before referred to, but because of defendant's conduct since his arrest, in pleading guilty, and saving the State the expense of a trial, and because

of the result of jury trials in which defendant's accessories, Goble and Sweeny, were given life sentences. We shall refer to the matters just mentioned, later in the opinion.

Appellant cites no cases; and the State cites but one, *State v. Smith,* 127 Iowa 528, and the statute making it murder in the first degree, when there is a killing under the circumstances here shown. As said, counsel for appellant state that the only question in the case is whether the sentence should be commuted to life imprisonment. The governor has power to do this. Constitution of Iowa, Article 4, Section 16; Chapter 73, Acts of the Thirty-ninth General Assembly. Code Section 5462 authorizes the Supreme Court to render such judgment on the record as the law demands, or render such judgment as the district court should have done, or reduce the punishment, etc. Under Section 5462, we have held that, in a proper case, we will reduce the punishment, if it is too severe. *State v. Madden,* 35 Iowa 511; *State v. Little,* 42 Iowa 51. This power will be exercised only when the court below has manifestly visited too severe a penalty, one disproportionate to the degree of guilt, as shown by the proof. *State v. Freeman,* 27 Iowa 333. To justify the exercise of such power, it must be made to appear that the punishment is excessive. *State v. Allen,* 32 Iowa 248; *State v. Wilmoth,* 63 Iowa 380. There must be some legal data upon which to base its action in reducing the sentence. *State v. Baughman,* 20 Iowa 497. In *State v. Houston,* 50 Iowa 512, it was held that the facts in a prosecution for murder were not such as to require a reduction of the sentence. So held, also, in other cases, as burglary, larceny, and so on. *State v. Franks,* 64 Iowa 39; *State v. Ritchie,* 69 Iowa 123; *State v. Heatherton,* 60 Iowa 175; *State v. Mower,* 68 Iowa 61. On the other hand, in a particular case, where the highest punishment was imposed for an act which was not the most aggravated form of the crime, it was held that the sentence was excessive, and it was reduced. *State v. Thompson,* 46 Iowa 699. That was an incest case, where a sentence of ten years was imposed. The court said that, while such a crime was revolting, and should be severely punished, still it, like every other crime, has its grades of aggravation and enormity, and, after stating some of the circumstances, held that

more aggravated cases of such crime frequently occurred. The sentence was reduced to five years. Other cases where the sentence was held excessive are *State v. Madden*, supra; *State v. Hayden*; 45 Iowa 11; *State v. Doering*, 48 Iowa 650; *State v. Moody*, 50 Iowa 443; and *State v. Sullivan*, 51 Iowa 142. In *State v. Fields*, 70 Iowa 196, it was held that the evidence was insufficient to support a verdict of murder in the first degree; but since defendant did not claim that he was not guilty of manslaughter, the court reduced the sentence to the proper one for the latter crime. However, in *State v. O'Donnell*, 176 Iowa 337, the death penalty was imposed by the jury in a conviction for first-degree murder. We held that the evidence was not sufficient to sustain a verdict of murder in that degree. In such a case, we held that we had no power to commute the sentence, because the statute gives the jury the exclusive power to determine the degree of the offense and to direct which of the two punishments fixed by statute shall be inflicted. At least, that was one of the grounds for so holding in that case. In that respect, the *O'Donnell* case differs from the instant case. In *State v. Upson*, 64 Iowa 248, a sentence of three years was imposed for grand larceny. The extenuating circumstances claimed were that defendant was young, and at the time of the larceny, was out of money, and intoxicated, and that it was his first offense. The punishment inflicted could have been ten years. The court said that the punishment was not unreasonably severe. Counsel for defendant sought to compare the facts in that case, and the length of imprisonment, with the situation in *State v. Moody*, supra. In the *Upson* case, the court said that there is no rule by which the punishment of criminals may or ought to be equalized in that way; that each case must be decided upon its peculiar facts, and each offender must receive the punishment he merits, without regard to the punishment inflicted upon others. We have not attempted to review all the cases above cited. Enough has been said to show that, in the ordinary case, the court has power, if it is proper to do so, to reduce a sentence, but that we should not do so unless there is some legal reason therefor. The State calls attention to *State v. Smith*, 127 Iowa 528, where the trial court imposed a sentence of death,

upon a plea of guilty to an indictment for murder. We held that there was a discretion vested in the trial court in such cases, and that this court "should not interfere, in the absence ·of a showing of abuse of that discretion. The case comes to us for correction of errors, and not that we may exercise the pardoning power. Commutation of sentence does not belong to this department of government." The judgment was affirmed.

Up to this point, we see no sufficient reason for interfering. There is no reason for interfering, unless it be the fact that defendant pleaded guilty. This does not in any manner lessen the degree of the defendant's guilt. Had the defendant demanded a jury trial, as he had a right to do, there would have been the possibility of a miscarriage of justice, and there would have been the temptation for defendant to take the stand and commit the added crime of perjury, in an attempt to escape punishment or to reduce the degree. There would have been, too, the added expense of the trial. This is a matter in which the public is interested. There are, no doubt, many cases where pleas of guilty should be entered. There would be no inducement to plead guilty if it was understood that the highest punishment would be inflicted. This would tend to discourage pleas of guilty where, in some cases at least, such pleas ought to be, and no doubt would be, entered. It is stated in oral argument that the other two persons concerned with this defendant in the robbery and killing have recently been tried, and the jury recommended life sentences. Possibly, had that situation existed at the time the trial court imposed the sentence herein, the death penalty would not have been inflicted. But that matter is not properly before us.

It is suggested by the attorney general that this defendant is the more guilty, because he held the revolver. In a sense, this may be true. In another sense, they were all three engaged in the robbery, and in that, all were equally guilty. The fact that they were engaged in a robbery is the thing, under the statute, which makes a killing murder in the first degree. In that sense, then, they were all equally guilty. If it shall be made to appear, in an application to the governor for commutation, that the two confederates of this defendant were by a

jury given life sentences, that fact, together with the fact that defendant has entered a plea of guilty will, no doubt, be given due consideration by the governor, who will determine whether, under all the circumstances, the defendant shall be given the more severe punishment. No legal reason appears in the record which would justify the court in interfering. It would be improper for the court to interfere, or seem to interfere, with the executive branch of the government and the prerogative of the governor, or suggest what his action should be. The governor would not assume to suggest to the court what its decision should be.

The judgment is—*Affirmed*.

STEVENS, C. J., EVANS, ARTHUR, and DE GRAFF, JJ., concur specially.

WEAVER, J., dissents.

FAVILLE, J., takes no part.

WEAVER, J. (dissenting).—With profound appreciation of my responsibility as a member of this court, I am compelled to record my dissent from the opinion prepared by Mr. Justice Preston. That opinion shows the evidence of the painstaking and conscientious care which is characteristic of its author, and nothing I have to say in the matter is intended to impeach its merit as an honest and forceful expression of his judgment upon the merits of the appeal. I am thoroughly persuaded, however, that it unduly narrows the authority and discretion of this court, and practically obliterates one of the most salutary powers with which the state has clothed this tribunal for the administration of justice.

In the very nature of things, it is morally impossible for the legislature, in enacting criminal laws, to do more than to define public offenses and prescribe in a general way for their punishment. Realizing that, even in the realm of crime, there are degrees and grades of turpitude, and that to assess the same dead level of penalty upon every person convicted of violating the same statute, without reference to extrinsic cir-

cumstances, would be often to perpetrate glaring injustice, our lawmakers have sought to introduce some reasonable degree of elasticity into the scheme of legal retribution. This tendency is shown in the provisions made for varying degrees of crime; in providing, in many cases, for a wide limit of penalty, within the discretion of the court; in providing a parole system for the benefit of convicted persons found worthy of such favor; in the power vested in this court, upon appeal, to "render such judgment on the record as the law demands; * * * affirm, reverse or modify the judgment, or render such judgment as the district court should have done, or order a new trial, or reduce the punishment." Code Section 5462. And finally, we have the constitutional prerogative of the governor to grant reprieves, commutations, and pardons. All these provisions are concessions to the evident truth that rules prescribing the nature and kind of punishment to be imposed for specific offenses must have some degree of flexibility, not alone in the interest of persons accused or convicted, but in the public interest as well.

The Code provision to which I have referred, Section 5462, directs that, upon appeal from a conviction:

"The Supreme Court *must* examine the record, *without regard to technical errors* * * * and render such judgment on the record as the law demands; it may affirm, reverse or modify the judgment, or render such judgment as the district court should have done, or order a new trial, or *reduce the punishment, but cannot increase it.*"

By this provision the court of last resort, viewing the case in the light of the entire record, free from the pressure and distraction inseparable from the trial of criminal offenses of a grave character, is clothed with broad and comprehensive power to control, within statutory limits, the imposition of the penalties of the broken law. It may affirm, reverse, or modify, or grant new trial, or reduce the penalty imposed by the trial court. The authority to modify or to reduce the punishment is not dependent upon the finding of any error in the rulings of the trial court. The record may be entirely free from error, and the guilt of the defendant may be admitted or confessed or otherwise shown beyond reasonable doubt; and yet the circum-

stances may be such as to fairly indicate that effective adminis-
tration of justice will be subserved and sounder public policy
promoted by modifying the harshness of the punishment; and
in such case, it is not only within the right and power of the
court, but becomes its duty, to exercise that power by ordering
such modification as, in its impartial discretion, it believes the
case requires. In the face of such responsibility, we have no
right to shift the burden from our own shoulders to those of
the executive. The majority have very fairly stated most of
the considerations which may properly move the governor to
exercise his constitutional power of commutation, and I shall
not attempt their repetition. They constitute as well the suf-
ficient reason for our own interference. Ours is not a pardon-
ing power; nor would the reduction of the sentence of death to
life imprisonment be in any sense akin to the exercise of such
power. Neither is it an assumption of power by the court to
fix the grade or degree of the defendant's crime. The fixing of
punishment or penalty within the limits fixed by the statute
is a judicial act, and it is only when the judicial power is ex-
hausted that application for executive clemency is available.

In holding that we should ourselves act, and reduce this
sentence to life imprisonment, I am moved by no maudlin sym-
pathy for the defendant. That he is guilty of murder in the
first degree there can be no doubt; and so long as the State
persists in the fatuous policy of trying to remove the stain of
the victim's blood by washing it in the blood of the slayer, he,
and such as he, cannot justly complain of the awful conse-
quences legally attached to the murderous act. Under the stat-
ute, however, the punishment for this crime may be either death
or imprisonment for life; and the question here presented is
whether, as between these alternatives, the situation is such as to
justify us in saying that the latter, rather than the former,
should be imposed. Taking the case even as stated by Justice
Preston, I am unhesitatingly in favor of such ruling. It is in
no spirit of criticism that I wish to note special exception to
some of the argument made use of by the majority. It is there
said that:

"We are asked to show mercy, where defendant showed

no mercy to his victim. We are asked to give greater consideration to his family than he himself gave them."

The question of legal prosecution and punishment of a criminal is not, or at least ought not to be, a question of vengeance. The fact that the criminal was savage and merciless affords no reason why the state or court should indulge in savagery. There are but two proper objects to be attained in proceedings to subject an accused to the penalty for his crime: one is to remove a menace to the peace, safety, and good order of society; and the other is its deterrent effect upon those inclined or tempted to violate the law. In so far as these considerations are lost sight of, or become subordinate to the popular cry for vengeance, to that extent we relapse toward barbarism and the rule of the mob. There is a point beyond which severity of punishment reacts, and defeats its own purpose, in its tendency to brutalize public sentiment. This has been demonstrated over and over in the history of our mother country, as well as in the development of our own domestic institutions.

I do not care to pursue the subject further at this time, except to say that, while the guilt of this man is not mitigated by the fact that he was one of three equal in responsibility for the crime; yet the fact that, although he confessed his offense, pleaded guilty, and gave the State efficient aid and support in convicting the others, he stands alone under penalty of death, while his equal partners in the offense are by the same court given life sentences, is a sorry commentary on the inequalities of legal justice.

Olander's crime is not to be extenuated by reference to the conditions into which he was born, and in which he was developed into a desperado. These are sufficiently referred to in the majority opinion. It remains true, nevertheless, that he is the product of our times. He was not the creator of the maelstrom of crime and lawlessness into which he was drawn, in common with the almost unbelievable numbers of young men and boys who are daily arraigned at the bar of justice all over our land. For this condition, the state, the nation, the great body of our citizenry, are all in some degree responsible; and until society shall awake to its responsibilities and its danger,

and adopt radical measures of reform by which the youth of the land may be won from idleness, immorality, and self-indulgence, and inspired with ambition to make the most of their opportunities and lead useful and honorable lives, our oft repeated hope that "this wave of crime" will soon subside is doomed to disappointment; and they who place their reliance on the occasional apprehension of an Olander and hanging him by the neck until dead, for the ushering in of a new day of peace and good order, will have to recast their theories, or invent some new scheme to so increase the horrors of death as to paralyze the nerve of the hardened criminal.

I am in favor of reducing the punishment of the defendant from death to life imprisonment.

EVANS, J. (concurring). I respect profoundly the scruples of my dissenting colleague as being very sincere; and I confess that they make more difficult for me the performance of my own duty, as I see it.

The punishment of the high crime of first-degree murder is not one of the humanities. Its performance must be coldly and sternly judicial, if it obtain at all. The personality of the judge is not and should not be an influence or factor therein. The penalty is not of his invention. The statute provides for a death penalty. In the absence of a jury trial, and upon a plea of guilty, the duty is cast upon the district court to fix the penalty. The penalty thus fixed in this case by the district court was warranted by the record before it. The record presented to us discloses no mitigating facts. This is frankly conceded by the distinguished counsel who has pleaded eloquently for a commutation of the sentence. Our jurisdiction in this case is appellate only. We are not justified in modifying the judgment below, unless there be some reason for it apparent in this record. We are not justified in arraying against the statute our own disinclination to impose its extreme penalty. In the dissenting views expressed by my colleague, I discover no reason suggested which would not, in effect, change the death penalty into a dead letter. If we commute the sentence at all, we must do so

substantially upon the ground that we are unwilling to impose death as a penalty for any crime, however heinous.

This statute is a very deliberate enactment. It is not the result of precipitate consideration. There was a time in this state when the death penalty was abolished. This legislative mercy bore its bitter fruit. The present statute was the solemn result of legislative reconsideration. The crime of first-degree murder is not only ruthless; it is usually the act of a reckless coward, who goes armed to waylay the unarmed and the unsuspecting. If there is any deterrent influence that can be set up beforehand against its commission, the fear of the death penalty would seem to be the most effective. Such, at least, is the legislative judgment, as expressed in the statute. It is not for us to say that this deterrent has not palsied many a murderous hand. Granted that it is a terrible penalty. Even so, it is less terrible than the crime. I concede that it should give way to mitigating facts, and that it is the urgent duty of this court to scan the record with open minds for the discovery of such facts. All this has been done. Our gleaning of the record has been futile.

I cannot agree that our appellate power is a power of pardon or commutation. The pardoning power is an executive one, and is distinctly conferred upon the chief executive. To this extent we agree. If conferred upon the chief executive, why should it be conferred upon this court? Our function is judicial. It is ours to determine the guilt or innocence of the defendant, and if he is guilty, to apply the penal statutes in such case provided. We have no function of executive mercy. Unless, upon this record, we can differentiate the offense therein disclosed from one of extreme guilt, and can find in the record mitigating reasons why the extreme penalty should not in this case be imposed, then we are without authority to interfere at all with the judgment of the trial court. I am not willing to array mere judicial power to the nullification of the statutory penalty, terrible as it is. To do so would not only encroach upon the legislative prerogative; it would give to the future assassin a sense of security, already and long too great and comfortable. I think the statutory sword of Damocles above his head should

be hung by a more slender thread, and that the terror thereof should be increased, rather than lightened. While we have pondered upon this record, as it is meet that we should do, murder has stalked like a hunter, unafraid, within the domain of our jurisdiction, leaving its red trail of dead men and ravished women. If there be any means discoverable by human wisdom whereby murder contemplated may be deterred by the punishment of murder done, such wisdom must find its expression by legislation. It is not a function of the judiciary to veto it.

With a due sense, therefore, of the solemnity of our responsibility in this case, I would let the statutory penalty fall. I concur fully in the majority opinion of Mr. Justice Preston.

STEVENS, C. J., ARTHUR and DE GRAFF, JJ., join in this concurrence.