481 S.E.2d 780

STATE of West Virginia ex rel. William C. FORBES, Petitioner Below, Appellee

v.

Honorable Gaston CAPERTON, Governor, State of West Virginia, and West Virginia Board of Parole, Respondents Below, Appellants

and

John Wayne FORD, Appellant.

STATE of West Virginia ex rel. William C. FORBES, Prosecuting Attorney in and for Kanawha County, Petitioner Below, Appellee

v.

Honorable Gaston CAPERTON, Governor, State of West Virginia, and West Virginia Board of Parole Respondents Below, Appellants.

STATE of West Virginia ex rel. William D. MOOMAU, Hardy County Prosecuting Attorney, Petitioner Below, Appellee,

v.

Gaston CAPERTON, Governor, State of West Virginia, and West Virginia Parole Board, Respondents Below, Appellants

and

Robert Meade LEACH, Appellant.

STATE of West Virginia ex rel. William D. MOOMAU, Hardy County Prosecuting Attorney, Petitioner Below, Appellee,

v.

Gaston CAPERTON, Governor, State of West Virginia, and West Virginia Parole Board, Respondents Below, Appellants.

Nos. 23575, 23577, 23576, 23578.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 29, 1996.

Decided Dec. 19, 1996.

 

ston Caperton, Governor, and West Virginia Parole Board.

George Castelle, Chief Public Defender, Lonnie C. Simmons, DiTrapano & Jackson, Charleston, for John Wayne Ford.

William D. Moomau, Hardy County Prosecuting Attorney, Moorefield, Pro Se.

David Schles, Stowers & Associates, Charleston, for Robert Meade Leach.

WORKMAN, Justice:

We consolidated these four appeals[1] because they arise from two cases involving similar factual and legal issues that were decided by the Circuit Court of Kanawha County. In the proceedings before the circuit court, William C. Forbes, Prosecuting Attorney of Kanawha County, and William D. Moomau, Prosecuting Attorney of Hardy County, Appellees herein and petitioners below (hereinafter Prosecutor Forbes, Prosecutor Moomau, or Appellees), challenged the authority of the Honorable Gaston Caperton, Governor of the State of West Virginia, Appellant herein and respondent below (hereinafter Governor),[2] to commute the sentences of John Wayne Ford and Robert Meade Leach, also Appellants herein (hereinafter Appellant Ford and Appellant Leach). In each case, the circuit court granted a writ of mandamus in favor of the respective prosecutor, and declared the Governor's commutation order void, *ab initio*, and mandated it be withdrawn. On appeal, Appellants generally claim the circuit court erred by ruling: (1) the Governor has no power to commute a sentence other than one for capital punishment; (2) mandamus is an appropriate remedy; and (3) Appellants Ford and Leach could not intervene in the underlying actions.[3]

Mary Beth Kershner, Assistant Prosecuting Attorney, Charleston, for William C. Forbes.

Donald L. Darling, Senior Deputy Attorney General, Chad Cardinal, Assistant Attorney General, Charleston, for Honorable Ga-

---

1. The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing October 15, 1996, and continuing until further order of this Court.

2. Along with the Governor, the West Virginia Parole Board was named as an Appellant herein and respondent below.

3. A single brief was filed on behalf of the Governor and the West Virginia Board of Parole, while independent briefs were filed by Appellant Ford, Appellant Leach, Prosecutor Forbes, and Prosecutor Moomau. The West Virginia Coalition Against Domestic Violence and the West Virginia Chapter of National Organization for Women filed an amicus curiae brief in support of the argument that the Governor has the power to commute sentences in non-capital cases. The amicus curiae brief emphasized the importance this procedure may have in cases of battered women who are incarcerated for crimes committed while defending against abuse. Ironically,

Upon review, we reverse the final orders of the circuit court.

I.

## FACTUAL AND PROCEDURAL HISTORY

In 1968, Appellant Ford was convicted by jury of first degree murder and received a sentence of life imprisonment without mercy.[4] In 1979, Appellant Leach committed a double murder and grand larceny. Similar to Appellant Ford, Appellant Leach was convicted by jury of first degree murder and received a sentence of life imprisonment without mercy for one of the slayings. Thereafter, Appellant Leach plead guilty to the second murder and to grand larceny and received a sentence of life imprisonment with mercy and a sentence of not less than one nor more than ten years for grand larceny. All three of Appellant Leach's sentences were ordered to run consecutively. Finding circumstances that he believed warranted changes in Appellant Ford's and Appellant Leach's sentences, the Governor, by orders dated December 8, 1995, commuted the life imprisonment without mercy sentences to life imprisonment with mercy and ordered Appellant Leach's sentences to run concurrently, making both Appellants Ford and Leach immediately eligible for parole.

After learning of the Governor's decision, Prosecutors Forbes and Moomau filed separate petitions for writs of mandamus in the Circuit Court of Kanawha County on December 27, 1995. The circuit court scheduled a consolidated hearing on the petitions for 9:30 a.m. on December 29, 1995. The rationale for holding the hearing so quickly apparently was to entertain arguments before Appellants Ford and Leach were provided parole hearings. The Governor and the West Virginia Parole Board were served notice of the hearing;[5] however, Appellants Ford and Leach were not named as parties or served notice.

Several people appeared at the hearing including: Prosecutor Moomau; Mary Beth Kershner and John Blevins, Assistant Prosecuting Attorneys for Kanawha County; Dana F. Eddy, General Counsel to the Governor; Donald L. Darling, Senior Deputy Attorney General; and Chad M. Cardinal, Assistant Attorney General. Also in attendance was George Castelle, Kanawha County Chief Public Defender, who currently serves as counsel for Appellant Ford. Mr. Castelle made no comments on the record at the hearing and, in fact, is not mentioned in the transcript of the proceeding as making an appearance. On appeal, Mr. Castelle states that at the time of the hearing he had no relationship with Appellant Ford, had not communicated with Appellant Ford, and had no authority to intervene on Appellant Ford's behalf.

The arguments at the hearing primarily centered upon the Governor's authority to commute sentences.[6] Near the conclusion of

Appellant Leach was incarcerated for the murder of his former girlfriend.

**4.** In *Ford v. Coiner*, 156 W.Va. 362, 196 S.E.2d 91 (1972), we affirmed the decision of the Circuit Court of Kanawha County to deny Appellant Ford's request for a writ of habeas corpus.

**5.** Prosecutor Moomau also served notice to the Honorable Darrell V. McGraw, Jr., Attorney General for the State of West Virginia.

**6.** An issue was raised with respect to whether the Governor requested the West Virginia Parole Board to investigate the commutation applications. If a request was made, it was argued the West Virginia Parole Board violated West Virginia Code § 62–12–13 (1992), by failing to give notice of the request to the sentencing judge and prosecuting attorney. West Virginia Code § 62–12–13(d)(4) provides, in relevant part:

The board shall, if so requested by the governor, investigate and consider all applications for pardon, reprieve or commutation and shall make recommendations thereon to the governor.

Prior to making such recommendation and prior to releasing any penitentiary person on parole, the board shall notify the sentencing judge and prosecuting attorney at least ten days before such recommendation or parole. The Governor was subpoenaed to appear and give testimony on this issue. Subsequently, a motion to quash the subpoenas was filed because it was asserted that all relevant evidence could be provided by Mr. Eddy, who personally did the investigation on behalf of the Governor. At the hearing held on December 29, 1996, the circuit court determined it need not reach the issue of West Virginia Code § 62–12–13, and the circuit court did not rule upon the motion to quash the subpoenas.

the hearing, Mr. Darling mentioned he was given very short notice to prepare for arguments on this matter—especially considering the constitutional implications. The circuit court inquired whether additional time was needed, but Mr. Darling responded no and said he considered the cases ripe for decision. After considering the arguments of the parties, the circuit court judge announced from the bench that she found the Governor did not have the power to commute the sentences and, by doing so, the Governor abused or exceeded his authority.[7] Consequently, the circuit court awarded the writs of mandamus. Subsequently, on January 4, 1996, Appellant Ford, *pro se*, wrote a letter to the circuit court stating he wished to appeal the decision and requested he be appointed counsel.[8]

On January 30, 1996, the circuit court entered a written order of its decision to grant the writ of mandamus requested by Prosecutor Forbes. A similar order was entered on February 21, 1996, with respect to the writ of mandamus awarded in favor of Prosecutor Moomau.[9] On February 13, 1996, the circuit court entered a memorandum order elucidating its January 30, 1996, order.

This memorandum order also contained a ruling that Appellant Ford did not have standing to appeal the circuit court's decision because he was not a party to the action and he did "not suffer[ ] an invasion of a legally protected interest and any loss he may have suffered would merely be conjectural or hypothetical." The court determined Appellant "Ford had only a unilateral hope of being paroled[, and] [a] mere hope would not be strong enough to result in an actual injury." Moreover, with respect to Appellant Ford's "letter" requesting appointed counsel, the circuit court refused to treat it as a habeas corpus petition, finding Appellant Ford was no stranger to the proper way one is filed.[10] Therefore, the circuit court denied Appellant Ford's request to appeal and to receive appointed counsel.

After being denied appointed counsel, Appellant Ford's current counsel, Mr. Castelle and Lonnie C. Simmons, agreed to represent him on a pro bono basis. On February 23, 1996, Appellant Ford's counsel filed an application to intervene and a motion to alter or amend the orders of January 30, 1996, and February 13, 1996. This request was denied by order dated March 12, 1996.[11]

---

7. Given the very limited amount of time the parties and the circuit court had to decide this matter, neither the parties nor the circuit court had the benefit of the extensive research we have on appeal.

8. After not receiving a response, Appellant Ford states he wrote a second letter to this Court on January 19, 1996, making the same request. By order dated February 14, 1996, we refused to issue a writ.

9. The Governor's commutation order for Appellant Ford states, in part:

Accordingly, it is hereby **ORDERED** that the Governor's Order, dated December 8, 1995, purporting to "commute" the sentence[s] of John Wayne Ford [Robert Meade Leach], be, and hereby is, declared void, *ab initio*. It is further **ORDERED** that the Petitioner's Petition for Writ of Mandamus be, and hereby is, granted. It is further **ORDERED** that the Respondent, Governor Gaston Caperton, be, and hereby is, mandated to withdraw his Order of Commutation in [and for] the sentence[s] of John Wayne Ford [Robert Meade Leach], dated December 8, 1995.

There are minor variations between this language and the relevant language contained within the Governor's order for Appellant Leach.

Most of the variations are indicated by the bracketed material in the above excerpt.

10. Records in the county circuit clerk's office revealed Appellant Ford filed habeas corpus petitions on at least seven occasions.

11. In the March 12, 1996, order, the circuit court disagreed with Appellant Ford's characterization of the mandamus action as a commutation revocation proceeding which gave him a liberty interest in the case. The circuit court said because it already resolved the only issue in the mandamus action, which was whether the Governor exceeded his authority, Appellant Ford could not intervene as there no longer was anything pending before the circuit court. The circuit court also stated Appellant Ford's reliance on Rule 24(a) of the West Virginia Rules of Civil Procedure to intervene is misplaced because the rule does not apply to mandamus proceedings. *See* W. Va.R.Civ.P. 81(a)(5). The circuit court analyzed Appellant Ford's claim under the intervention proceedings at common law, but it found Appellant Ford failed to meet the necessary criteria.

Moreover, the circuit court found Appellant Ford could not intervene because he did not apply for intervention in a timely manner. In

■ Like Appellant Ford, Appellant Leach obtained counsel and, on April 5, 1996, filed an application to intervene and a "motion for relief from judgment and to vacate judgment and [a] motion to set aside, alter or amend judgment." By letter dated April 19, 1996, the circuit court stated it was denying these requests for the same reasons set forth in its order dated March 12, 1996. An order to this effect was entered on May 15, 1996. The following appeals were then filed in this Court by Appellant Ford, Appellant Leach, and the Governor, together with the West Virginia Parole Board. The issue before this Court is purely a question of law involving constitutional construction, therefore, our review is de novo and plenary. *State ex rel. Cooper v. Caperton*, 196 W.Va. 208, 213–14, 470 S.E.2d 162, 167–68 (1996).

## II.

## DISCUSSION

### A.

#### Definitions

■ Before we can have any intelligent discussion with respect to these cases, it is essential that we first set forth the common definitions of the words commute and pardon. Given its ordinary meaning in criminal law, the term "commute" (or commutation) indicates "the change of a punishment to one which is less severe...." *Black's Law Dictionary* 280 (6th ed.1990). On the other hand, the term "pardon" means "[a]n executive action that mitigates or sets aside punishment for a crime. An act of grace from governing power which mitigates the punishment the law demands for the offense and restores the rights and privileges forfeited on account of the offense." *Id.* at 1113 (citation omitted).[12] A pardon can come in many forms. For instance, an "absolute pardon" frees a criminal without restrictions, while a "conditional pardon," as is evident by its name, frees a criminal upon conditions. The conditions may require the performance or nonperformance of a specific act which is essential to the pardon's validity. *Id.*[13]

■ Although a commutation is not synonymous with a pardon, it is well established throughout the United States today that the power to pardon generally encompasses the lesser power to commute. As stated in 59 Am.Jur.2d *Pardon and Parole* § 23 (1987):

> The power to commute a sentence is a part of the pardoning power and may be exercised under a general grant of that power. The general power necessarily contains in it the lesser power of remission or commutation. If the whole offense may be pardoned, a fortiori, a part of the punishment may be remitted or the sentence commuted.

*Id.* at 20; *see also Ricks v. State*, 882 S.W.2d 387, 391 (Tenn.Crim.App.1994) (providing "it is a well-established principle of law that the power to 'grant reprieves and pardons' embraces the right to commute a sentence");

---

this regard, the circuit court found: (1) the December 29, 1995, hearing was widely publicized; (2) Appellant "Ford did not ask to intervene prior to that hearing"; (3) Mr. Castelle was present at the hearing and did not move to intervene on behalf of Appellant Ford; and (4) Appellant Ford and Mr. Castelle did not file to intervene for nearly two months after the hearing. For the application for intervention to be considered as timely filed, the circuit court concluded the application should have been made prior to the hearing or, at least, prior to the order entered on January 30, 1996. Finding Appellant Ford was neither a party nor had the right to intervene, the circuit court held Appellant Ford could not alter or amend the judgments pursuant to Rule 58(e) of the West Virginia Rules of Civil Procedure because, under the expressed language of the Rule, the procedure only can be used by a party to the action.

**12.** In *County Commission of Mercer County v. Dodrill*, 182 W.Va. 10, 385 S.E.2d 248 (1989), we said a "reprieve" has been interpreted to mean:

> "Temporary relief from or postponement of execution of criminal punishment or sentence. It does no more than stay the execution of a sentence for a time, and it is ordinarily an act of clemency extended to a prisoner to afford him an opportunity to procure some amelioration of the sentence imposed. It differs from a commutation which is a reduction of a sentence and from a pardon which is a permanent cancellation of a sentence."

*Id.* at 12 n. 1, 385 S.E.2d at 250 n. 1 (quoting *Black's Law Dictionary* 1170 (5th ed.1979)).

**13.** However, a condition may not be violative of the constitution or, otherwise, be illegal, immoral, or impossible to perform. *See* 67A C.J.S. *Pardon & Parole* § 23 (1978).

67A C.J.S. *Pardon and Parole* § 33 (1978) (stating power to pardon contains lesser power to commute). One exception to this general principle can occur when the pardoning power is restricted by constitutional or statutory provisions.[14] In the present consolidated appeals, the issue confronting this Court is whether our constitution contains such a limitation upon our Governor's general power to pardon.

### B.

*Commutative Language Contained within Article VII, Section 11 of the West Virginia Constitution*

Any inquiry of constitutional application or interpretation fundamentally must begin with an examination of the actual language of the constitutional provision at issue. *See Randolph County Board of Educ. v. Adams,* 196 W.Va. 9, 15, 467 S.E.2d 150, 156 (1995) (stating "[t]he starting point in every case involving construction of our Constitution is the language of the constitutional provision at issue"). The authority of the Governor to remit fines and penalties, commute capital punishment, and grant reprieves and pardons is set forth in Article VII, Section 11 of the West Virginia Constitution. This constitutional provision provides in full:

> The governor shall have power to remit fines and penalties in such cases and under such regulations as may be prescribed by law; *to commute capital punishment and,*

*except where the prosecution has been carried on by the house of delegates, to grant reprieves and pardons after conviction;* but he shall communicate to the legislature at each session the particulars of every case of fine or penalty remitted, of punishment commuted and of reprieve or pardon granted, with his reasons therefor.

W. Va. Const. art. VII, § 11 (emphasis added). This provision has remained unchanged since its adoption as part of the West Virginia Constitution of 1872. Nevertheless, the specific issue before this Court is one of first impression.

Within the context of this provision, the parties focus on the language "to commute capital punishment," and they disagree as to what impact this language has on the Governor's power to commute a sentence which does not impose capital punishment.[15] Although Appellees admit this provision gives the Governor the general right to pardon an offense after conviction, they claim the language "to commute capital punishment" means the Governor may not "commute" any sentence other than one imposing death. On the other hand, Appellants argue the language "to commute capital punishment" was included in the provision to expand upon the Governor's general pardoning power. With respect to this argument, Appellant Ford states that "throughout the 19th Century, and continuing into the 20th Century, there

**14.** For examples of state constitutions which either explicitly limit or authorize limitations or regulations on the power to pardon or commute, see Ariz. Const. art. 5, § 5 (providing "[t]he Governor shall have power to grant . . . commutation . . . and pardons, after convictions, for all offenses except treason and cases of impeachment, upon such conditions and with such restrictions and limitations as may be provided by law"); Colo. Const. art. IV, § 7 (stating "[t]he governor shall have power to grant . . . commutation"[s]" and pardons after conviction, for all offenses except treason, and except in case of impeachment, subject to such regulations as may be prescribed by law relative to the manner of applying for pardons"); Kan. Const. art. 1, § 7 (declaring "[t]he pardoning power shall be vested in the governor, under regulations and restrictions prescribed by law"); Mich. Const. art. 5, § 14 (pronouncing "[t]he governor shall have power to grant . . . commutations and pardons after convictions for all offenses, except cases of

impeachment, upon such conditions and limitations as he may direct, subject to procedures and regulations prescribed by law"); S.C. art. IV, § 14 (stating, "[w]ith respect to clemency, the Governor shall have the power only to grant reprieves and to commute a sentence of death to that of life imprisonment. The granting of all other clemency shall be regulated and provided for by law"); Utah Const. art. VII, § 12 (providing "Board of Pardons . . . upon such conditions as may be established by the Legislature, may . . . commute punishments . . . and grant pardons after convictions, in all cases except treason and impeachments, . . . but no . . . commutation or pardon [shall be] granted, except after a full hearing before the Board"); Wash. Const. art. 3, § 9 (mandating "[t]he pardoning power shall be vested in the governor under such regulations and restrictions as may be prescribed by law").

**15.** Capital punishment was abolished in West Virginia in 1965. W. Va.Code § 61–11–2 (1992).

was a continual debate regarding whether the death penalty could be commuted to life imprisonment, absent specific authorization." (Emphasis deleted). Thus, Appellant Ford maintains this language was included in the provision to make it clear—by specific authorization—that the Governor holds the power to commute capital punishment sentences.

Before we embark down the treacherous path of researching the history of this provision in an attempt to decipher the framers' intent therefrom, we first must determine whether the meaning of the language "to commute capital punishment" is clear on its face. If so, it should be applied and not construed. As we repeatedly have stated: "Clear and unambiguous language is itself the best expression of the framer's intent. However, if the language of the constitutional provision is ambiguous, then the 'ordinary principles employed in statutory construction must be applied to ascertain such intent.'" *Adams*, 196 W.Va. at 16 n. 8, 467 S.E.2d at 157 n. 8 (quoting *State ex rel Brotherton v. Blankenship*, 157 W.Va. 100, 108, 207 S.E.2d 421, 427 (1973); also citing *Diamond v. Parkersburg–Aetna Corp.*, 146 W.Va. 543, 122 S.E.2d 436 (1961)). Furthermore, although this Court is vested with the authority "to construe, interpret and apply provisions of the Constitution, . . . [we] may not add to, distort or ignore the plain mandates thereof." *State ex rel. Bagley v. Blankenship*, 161 W.Va. 630, 643, 246 S.E.2d 99, 107 (1978).[16] With these principles in mind, we proceed to examine the provision at issue.

The sentence containing the language "to commute capital punishment," in most relevant part, states: "The governor shall have power . . . to commute capital punishment and, except where the prosecution has been carried on by the house of delegates, to grant reprieves and pardons after conviction. . . ." By studying this sentence, we find the language "to commute capital punishment" is ambiguous. Without researching the history of this provision, it purely would be conjecture for us to declare these words are those

of limitation, rather than words of accretion. Moreover, we find it is impossible to look at the face of this language and determine whether our constitutional progenitors positively bestowed upon the Governor a clear right to grant commutations in death penalty cases without limiting other instances of commutation, or whether our progenitors renounced the Governor's right to grant commutations in any situations other than death penalty cases.

When we look beyond the immediate sentence in which the language is found and consider it in the context of the entire provision within which it falls, we find the ambiguity remains. The last part of the constitutional provision states that the Governor "shall communicate to the legislature at each session the particulars of every case of fine or penalty remitted, of punishment commuted and of reprieve or pardon granted, with his reasons therefor." However, this language brings us no closer to proclaiming the language is clear on its face.

It could be argued as to the last part of the provision that it merely modifies the language in the first part of the provision. Indeed, we recognize the specified actions the Governor may take in the first half of the provision ("remit fines and penalties," "commute capital punishment," and "grant reprieves and pardons") are parallel to the specified actions the Governor must report and explain to the Legislature in the last half of the provision ("fine or penalty remitted," "punishment commuted," and "reprieve or pardon granted"). Consequently, an argument could be made that the Governor's responsibility to report and explain "punishment commuted" only applies to its parallel reference—"to commute *capital* punishment." However, the framers of this provision left out the word "capital" in referring to "punishment commuted," making the language nonspecific. In light of its nonspecificity, a strong argument can be made that the Governor's commutative power transcends the capital punishment arena to include other types of sentences.

---

**16.** There are some exceptions to the rule that a constitutional or statutory provision must be construed literally. For an explanation of such exceptions, see 2A Norman J. Singer, *Sutherland's Statutes and Statutory Construction* § 46.07 at 126–27 (5th ed.1992).

Nevertheless, it is well established that this Court will not engage in mere speculation when interpreting a constitutional provision but, in cases of ambiguity, will "venture into extratextual territory in order to distill an appropriate construction." *State ex rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.*, 194 W.Va. 770, 777, 461 S.E.2d 516, 523 (1995); *see also State ex rel. Bd. of Gov. of W. Va. Univ. v. Sims*, 133 W.Va. 239, 247–48, 55 S.E.2d 505, 509 (1949) (stating authorization for expenditure "should rest upon direct legislation, and not upon a strained construction of the statute, on supposed implication or conjecture as to the legislative purpose"). Considering the ambiguity we find on the face of the provision, it therefore becomes necessary for us to explicate its history.

### C.

*History of Article VII, Section 11 of the West Virginia Constitution*

After extensive research on the history of this constitutional provision, we find the language "to commute capital punishment" was added to make clear the Governor has the power to commute death penalty sentences. This explicit grant of power, however, was not intended to limit the Governor's commutative power solely to death penalty cases. Thus, the Governor retains the right to commute other types of sentences pursuant to the general pardoning powers under Article VII, Section 11.

At common law, the king's prerogative to extend his mercy in the nature of a pardon virtually was unfettered. *Schick v. Reed*, 419 U.S. 256, 262, 95 S.Ct. 379, 383, 42 L.Ed.2d

430 (1974). If the king chose to exercise his pardoning power, he could do so by imposing both penal and nonpenal conditions upon the pardon. *Id.* at 261, 95 S.Ct. at 382. In exercising such power, the king generally was preoccupied with capital cases because there were no less than 160 capital offenses in England. *State ex rel. Stafford v. Hawk*, 47 W.Va. 434, 435, 34 S.E. 918 (1900).

When the early state constitutions were being drafted in this country, the drafters of those constitutions were well aware of the pardoning practices in England. *Cf. Schick*, 419 U.S. at 260, 95 S.Ct. at 382 (finding no extended constitutional debate with respect to Article II, Section 2, Clause 1 of the United States Constitution because the drafters were aware of the English Crown's power to alter and reduce a punishment). In 1776, a predecessor to our constitutional provision appeared in Chapter 4, Section 9 of the Virginia Constitution. This provision vested the Governor with the power to grant reprieves or pardons, but this vestment contained some restrictions. For instance, the Governor's clemency power could be restricted by other laws, and the constitutional provision itself stated the Governor could not grant a reprieve or pardon to someone prosecuted by the House of Delegates.[17]

Some of the first laws restricting the Governor's ability to pardon offenses occurred shortly after the passage of the 1776 Virginia Constitution and covered individuals convicted of treason, a capital offense. In treason cases, the Governor could not issue a pardon and only had the authority to suspend execution until the General Assembly gathered and determined the condemned's fate.[18] In

---

**17.** Chapter 4, Section 9 of the Virginia Constitution of 1776, provided, in part that the Governor

shall, with the advice of the Council of the State, have the power of granting reprieves or pardons, except where the prosecution shall have been carried on by the House of Delegates, or the law shall otherwise particularly direct; in which cases, no reprieve or pardon shall be granted, but by resolve of the House of Delegates.

In 1830, the Constitution of Virginia was amended, and the provision relating to reprieves and pardons was embodied in Article IV, § 4. With slight modifications from the previous version, this amended provision provided, in part, that

the Governor "shall have power ... to grant reprieves and pardons, except where the prosecution shall have been carried on by the house of delegates, or the law shall otherwise particularly direct...." Va. Const. art. IV, § 4 (as amended in 1830).

**18.** *See* 1783 Va. Acts ch. 3, §§ I & III, *A Collection of all such Public Acts of the General Assembly, and Ordinances of the Conventions of Virginia, Passed Since the Year 1768, as now in force, in* The First Laws of the State of Virginia 40 (Michael Glazier, Inc., 1982) (stating, in part, an individual convicted of treason "shall suffer death without benefit of clergy...." and "the" Governor shall not "have or exercise a right of

1782, the General Assembly exercised it pardoning ability for certain individuals convicted of treason by granting "conditional pardons." Va.Code (11 Hen.) ch. IX, §§ I to III (Va.1782). Upon review of the treason convictions of several men, the General Assembly pardoned four men on the condition they serve as continental soldiers in the war, while another two men were banished from Virginia until the end of the war. *Id.* Moreover, in 1785, an Act was passed that specifically gave the Governor the power to grant reprieves and pardons in capital offenses "upon such conditions of bodily labor to be performed by each person so pardoned or reprieved, as to the governor, with the advice of council, shall seem proper." Va.Code (12 Hen.) ch. XIII, § I (1785).[19] Although pursuant to this statute, the Governor could not issue a conditional pardon in cases of murder or treason, it is clear, nonetheless, that at a time in close proximity to the adoption of the 1776 Virginia Constitution, it was understood pardons could be granted with conditions attached.

In 1837, in the case of *Ball v. Commonwealth,* 35 Va. (8 Leigh) 726 (1837), the Supreme Court of Appeals of Virginia was called upon to determine whether a new trial could be awarded, after a felony conviction, on a claim that the verdict was contrary to the evidence. *Id.* at 727. The trial court held it did not have such power and

said the defendant's only recourse was to seek mercy from the Governor. *Id.* In deciding the case on appeal, the Virginia Supreme Court found a pardon only discharges a convict from the punishment inflicted, however, an acquittal discharges a person from guilt. *Id.* at 728. Without mentioning the previous authority and use of conditional pardons in Virginia, with a swoop of the pen, the court further stated that the pardoning power in Virginia is "more limited than that of the king of England," and while "[c]onditional or commutative pardons are often granted [in England,] .... with us pardons are, constitutionally or from practice, unconditional and absolute." *Id.* at 730. Therefore, according to the court, if someone is pardoned, the punishment is discharged completely, but if a new trial is granted, a defendant may be convicted and punished of a different offense warranted by the evidence. *Id.* at 731. On these principles, the court reversed and remanded the case for a new trial. *Id.*

In December of 1846, a group of revisors filed a report with the General Assembly, making recommendations and suggested changes to the civil code of Virginia. Va. Rev. Report title 10, § 17 (1849). As part of the recommendations and changes, the revisors believed it was necessary to clarify the law with respect to the Governor's power to pardon. *Id.* at 82–83. In the comment sec-

---

granting pardon to any person or persons convicted ... [of treason], but may suspend the execution until the meeting of the General Assembly, who shall determine whether such person or persons are proper objects of mercy or not, and order accordingly").

As is evident by Acts passed in 1796, 1802, 1814, and 1816, the General Assembly punished treason in different ways. Finally, however, the General Assembly provided in Virginia Code Chapter 162, Sections 1 and 9 (1819):

1. ... [A person convicted of treason] shall suffer death, by hanging by the neck, without benefit of clergy.

....

9. The Governor ... shall in no wise have or exercise a right of granting pardon to any person or persons convicted of treason ...; but, with the advice of the council, may suspend the execution until the meeting of the General Assembly, who shall determine whether such person or persons are proper objects of mercy, or not.

Va.Code ch. 162, §§ 1, 9 (1892 rev.). Consequently, treason once again was deemed a capital offense, and the Governor was limited to suspending such a death sentence until the General Assembly could exercise its power to grant mercy.

**19.** This provision states in full:

*BE it enacted by the general assembly,* That it shall be lawful for the governor, and he is hereby empowered, with the advice of the council of state, to pardon or reprieve any person or persons adjudged or sentenced to suffer death for a felonious offence [sic], upon such conditions of bodily labor to be performed by each person so pardoned or reprieved, as to the governor, with the advice of council, shall seem proper. *Provided always,* That no conditional pardon shall be granted by the governor, for murder or treason.

Va.Code (12 Hen.) ch. XIII, § I (emphasis original). By its own terms, this statute expired after December 31, 1786. *Id.*

tion, the revisors said that it is clear the king had the power to issue conditional pardons under common law; however, the revisors stated "the regularity of a conditional pardon in *Virginia* has been doubted." *Id.* at 83 (emphasis original). To illustrate, the revisors looked at the very recent adoption of an Act contained in 1846 Va. Acts ch. 90. The revisors concluded this Act "furnishes the strongest evidence that in the opinion of the general assembly, *the power to commute the punishment prescribed by law, ought, in certain cases, to exist somewhere. And certainly, if it is to exist any where, the executive is the proper department to exercise it.*" *Id.* (emphasis added).[20]

The relevant portion of the revisors suggested changes to the civil code appeared in title 10, § 17 of the revisors' report. In relevant part, the provision suggested by the revisors stated:

"In any case wherein the governor has power ... to ... pardon, instead of granting the same unconditionally, he may, after sentence, upon the petition of the person sentenced, grant him a pardon upon such conditions, with such restrictions, and under such limitations, as may be deemed proper by the governor, and be assented to by the petitioner; and for the purpose of carrying into effect such conditional pardon, he may issue his order or warrant, directed to any proper officer.... Especially it shall be the duty of the superintendent of the penitentiary to receive therein, on such order or warrant, any person convicted of any crime punishable with death, who shall be pardoned on condition of being confined in the penitentiary, either for life, or for a term of years, and to confine

such person according to the terms of such condition."

Va. Rev. Rep. title 10, § 17. Therefore, this proposed statute attempted to make clear the Governor had the general power to pardon offenses either with or without conditions, including the Governor's power to "pardon" a death sentence upon condition of life imprisonment or a term of years.

Although these suggestions were rejected by the General Assembly, the Constitution of Virginia was amended in 1851, and Article IV, Section 4 of the 1830 Constitution was changed. The new version of the constitutional provision stated, in part, that the Governor

shall have power to remit fines and penalties in such cases and under such rules and regulations as may be prescribed by law; and, except when the prosecution has been carried on by the house of delegates, or the law shall otherwise particularly direct, to grant reprieves and pardons after conviction, *and to commute capital punishment;* but he shall communicate to the general assembly, at each session, the particulars of every case of fine or penalty remitted, of reprieve or pardon granted, and of punishment commuted, with his reasons for remitting, granting or commuting the same.

Va. Const. art. V, § 5 (as amended; emphasis added). This amendment is the first time the language "to commute capital punishment" was included in the constitutional provision, and, for the most part, it contains the language included in our current constitutional provision.[21]

---

**20.** The Act referred to by the revisors related to arson. This Act gave more power to juries and courts to decide what punishments should be given under the circumstances. 1846 Va. Acts ch. 90. The Act provided, in part:

[I]t shall and may be lawful for the jury ... in lieu of the punishment of death now affixed for said crime ... in their discretion to affix the punishment ... to a confinement in the public jail and penitentiary-house for and during the life of such criminal, or for a shorter period, so that the same be not less than ten years.

It further gave the courts the power to grant a new trial "to graduate the punishment more nearly to the justice of the case and policy of this

act" for cases in which a "verdict may have been rendered...."

**21.** In reviewing the *Register of the Debates and Proceedings of the Va. Reform Convention* (1851), we find the word "capital" was not included in the report made by the Executive Committee at the first reading on January 11, 1851. Rather, this word was added at the second reading which occurred on July 14, 1851. We were unable to find any discussion explaining the reason behind the addition. Therefore, we must continue to interpret and decipher why the word was included.

Almost immediately thereafter, the General Assembly passed a specific Act to address the Governor's power "to commute capital punishment." 1852 Va. Acts ch. 104, § 1. This Act provides:

> That in any case in which the governor shall exercise the power conferred on him by the constitution to commute capital punishment, he may issue his order to the superintendent of the penitentiary requiring him to receive and confine (and the superintendent shall receive and confine) in the penitentiary, according to such order, the person whose punishment is so commuted. To carry into effect any commutation of punishment, the governor may issue his warrant directed to any proper officer; and the same shall be obeyed and executed.

In 1860, this Act was codified as Virginia Code title 10, ch. 17, § 19 (1860). In examining this statute, we believe the General Assembly contemplated two types of commutation. The first sentence clearly refers to the explicit power given to the Governor to commute capital sentences pursuant to the 1851 Constitution. In a capital case, the Governor may issue a warrant to the superintendent of the penitentiary. The second sentence, however, is general and refers to "any commutation of punishment" and provides, in "any commutation," the Governor may issue a warrant "to any proper officer." In our opinion, this sentence indicates that the General Assembly presumed the Governor could commute non-capital offenses. We believe this statutory framework, adopted in such close proximity to the 1851 Constitution, evidences the fact the phrase "to commute capital punishment" was added to make clear the Governor possessed such power in capital cases, but it was not designed to limit the Governor's power in other cases.

Moreover, around this same time, a debate was beginning in this country as to whether the President (or Governor) had the power to "commute" a capital sentence to one of life imprisonment. The United States Supreme Court addressed this issue in *Ex parte Wells*, 59 U.S. (18 How.) 307, 15 L.Ed. 421 (1855). In *Wells*, the defendant was sentenced to be hung for murder, and the President of the United States "granted him a conditional pardon." *Id.* at 308. The relevant part of the order granting the conditional pardon stated that the defendant's "sentence of death is hereby *commuted to imprisonment for life* ...." *Id.* (emphasis added). The defendant accepted and signed the order. *Id.*

The general question raised on appeal was whether the President had the authority to grant a "conditional pardon" for a death sentence. *Id.* at 309. The Supreme Court discussed the common law background of the pardoning power of the king, and it found that Article II, Section 2 of the United States Constitution [22] (giving the President the power to pardon) conferred to the President the right to grant a pardon upon conditions. *Id.* at 310–15.

However, the Honorable John McLean, Justice, dissented, arguing the issue presented in *Wells* is a "commutation" of a death sentence. *Id.* at 317. Justice McLean stated when a commutation is used it "overrides the law and the judgments of the courts. It substitutes a new, and, it may be, an undefined punishment for that which the law prescribes a specific penalty. It is, in fact, a suspension of the law, and substituting some other punishment which, to the Executive, may seem to be more reasonable and proper." *Id.* at 319. Although Justice McLean was not opposed to commutation itself, he believed it must be regulated and exercised by law and not left to the President's discretion. *Id.* at 328. In essence, Justice McLean stated that commutation is not a conditional pardon, and there is no authority to give effect to a commutation. Therefore, Justice McLean found the commutation should be void and the "pardon" should be made absolute. *Id.*[23]

**22.** This provision provides, in part, the President "shall have Power to grant Reprieves and Pardons for Offences [sic] against the United States, except in cases of impeachments." U.S. Const. art. II, § 2.

**23.** For examples of other courts which have touched upon this issue, see *State v. Olander*, 193 Iowa 1379, 186 N.W. 53 (Iowa 1922); *Ex Parte Janes*, 1 Nev. 319 (1865); *People ex rel. Patrick v.*

In 1863, West Virginia became a state after its split from Virginia, and we passed our first constitution. The relevant provision giving the Governor the power to pardon was adopted in Article V, § 3 of the West Virginia Constitution of 1863.[24] This provision, in relevant part, is very similar to the Virginia Constitution of 1851, and it contains the troublesome language "to commute capital punishment" we now debate. W. Va. Const. art. V, § 3. This initial constitution, however, only survived for nine years before a new constitution was adopted 1872. The new constitution incorporated the relative part of the Article V, Section 3 into Article VII, Section 11, which still remains in effect today. The 1863 Constitution and the 1872 Constitution are virtually the same with respect to the Governor's power to pardon.

Our legislature passed a related statute referring to the pardoning power in 1868. W. Va.Code ch. 14, § 20 (1868). Interestingly, although rejected in Virginia, the drafters of this statute took the language recommended by the revisors in Virginia in 1846 and combined it with the final sentence of Virginia Code title 10, ch. 17, § 19, codified in 1860. In full, West Virginia Code Chapter 14, Section 20 states:

> In any case wherein the governor has power to grant a pardon, instead of granting the same unconditionally he may, after sentence, grant it upon such conditions as may be deemed proper by him, and be assented to by the person sentenced; and for the purpose of carrying into effect such conditional pardon, the governor may issue his order or warrant, directed to any proper officer, which shall be obeyed and executed, instead of the sentence that was originally awarded. Especially it shall be the duty of the superintendent of the peni-

tentiary to receive and confine therein, according to such order or warrant, any person convicted of a crime punishable with death, who shall be pardoned on condition of being confined in the penitentiary. And in any case in which the governor shall exercise the power conferred on him by the constitution to commute capital punishment, he may, to carry such commutation into effect, issue his order or warrant, to be obeyed and executed in like manner.

*Cf.* Va. Rev. Rep. title 10, § 17; Va.Code title 10, ch. 17, § 19. This statute subsequently was revised in 1882. 1882 W. Va. Acts ch. 144. The first half of the revised version recites Article VII, Section 11 of the West Virginia Constitution, while the second half of this version recites the 1868 version of West Virginia Code Chapter 14, Section 20. As a result, the language became confusing.

In 1887, this language was codified in West Virginia Code Chapter 14, Section 20, and this provision remained unchanged until 1931. At that time, the revisors of our code realized West Virginia Code Chapter 14, Section 20 was ambiguous with respect to a "commutation of sentence." W. Va.Code § 5-1-16 (1931) (Revisers' Note). The revisors believed it probably occurred as a result of "the combining of provisions in the Report of the Revisers of the Code of 1849 pertaining to conditional pardons, but not adopted in Virginia, with the provisions of the Code of 1860 as to commutation of sentence." *Id.* The revisors stated "[t]he section as now revised provides for any commutation of sentence, and, for the sake of completeness, retains the conditional pardon provi-

*Frost,* 133 A.D. 179, 117 N.Y.S. 524 (1909); *In re Victor,* 31 Ohio St. 206 (1877).

**24.** In part, Article V, Section 3 of the 1863 Constitution provides that the Governor
shall have power to remit fines and penalties in such cases and under such regulations as may be prescribed by law; to commute capital punishment; and, except when the prosecution has been carried on by the House of Delegates, to grant reprieves and pardons after conviction; but he shall communicate to the Legislature, at each session, the particulars of every

case of fine or penalty remitted, of punishment commuted, and of reprieve or pardon granted, with his reasons for remitting, commuting, or granting the same.
We notice one difference between the Virginia and West Virginia Constitutions is that West Virginia arguably gave the Governor even more power than Virginia because the drafters did not include in the West Virginia Constitution the phrase "except when ... the law shall otherwise particularly direct ..." as was contained in the Virginia Constitution of 1851.

sions...."[25] Today, this version of the statute remains the same, and it is codified in West Virginia Code § 5–1–16 (1994).

In addition to the relevant constitutional and statutory provision, the parties in the present case also focus on a decision that was rendered in 1872 addressing an issue with respect to Virginia's Governor's power to commute and grant conditional pardons. *Lee v. Murphy*, 63 Va. (22 Gratt.) 789 (1872). In *Lee*, a prisoner was sentenced to imprisonment for three years, and the Governor executed a warrant stating the defendant "is a fit subject for commutation of sentence.... from imprisonment in the penitentiary ... into imprisonment in the city jail ... for the term of twelve months from the date hereof." *Id.* at 798–99. On the warrant, there was a place for the prisoner to sign, which he did. Thereafter, the question arose whether the Governor had the authority to issue this warrant. *Id.*

In resolving the case, the court stated it is important to recognize the difference between a conditional pardon and a commutation. According to the court, "[a] conditional pardon is a grant, to the validity of which acceptance is essential. It may be rejected by the convict; and if rejected, there is no power to force it upon him. A commutation is the substitution of a less for a greater punishment, by authority of law, and may be imposed upon the convict without his acceptance, and against his consent." *Id.* at 798. In Virginia, however, the court said "*the executive is only authorized to commute capital punishment;* whereas he may grant conditional pardons in all cases legally involving an exercise of the pardoning power." *Id.* (emphasis added). The court then concluded the warrant given to the prisoner was a "conditional pardon" because it required the prisoner's signature, reasoning "[c]ommutation is simple [sic] the substitution of a less for a greater penalty or punishment. If followed by the acceptance of the convict, it practically amounts to the same thing as a conditional pardon." *Id.* at 801.

In the present case, because we adopted the phrase "to commute capital punishment" from Virginia, Prosecutors Forbes and Moomau assert we should adhere to the language in *Lee* indicating the Governor only has power to commute capital punishment. After reviewing *Lee*, however, we find this statement was made in a cursory fashion and without clear explanation. In addition, the Virginia court still permitted the warrant to take effect by craftily changing it from a "commutation" to a "conditional pardon" on the basis of the prisoner's consent. In fact, as we look back over the constitutional and legislative history, we believe the language "to commute capital punishment" was added to ensure the Governor of Virginia could commute a sentence of capital punishment, and it was not intended to limit the Governor's ability to commute other offenses. Moreover, although Virginia inserted the language "to commute capital punishment" in its constitution just a few years prior to the decision in *Wells*, delegates at the Virginia convention may have been aware of the commutation of capital sentences debate before it

---

**25.** As amended, West Virginia Code § 5–1–16 provides:

> The governor shall have power to remit fines and penalties, in such cases and under such regulations as now are or may be prescribed by law; to commute punishment, and, except where the prosecution was carried on by the House of Delegates, to grant reprieves, paroles and pardons, after conviction; but he shall record in the journal of executive proceedings and communicate to the legislature, at its next session, the particulars of every case of fine or penalty remitted, of punishment commuted, and of reprieve, parole or pardon granted, with his reasons therefor. In any case wherein the governor has power to grant a pardon, instead of granting the same unconditionally, he may, after sentence grant it upon such conditions as he may deem proper, with the assent of the person sentenced; and, for the purpose of carrying into effect such conditional pardon, the governor may issue his warrant directed to any proper officer, who shall obey and execute it, instead of the sentence originally awarded. In any case in which the governor shall exercise the power conferred on him by the constitution to commute capital punishment, he may issue his order to the warden of the penitentiary, requiring him to receive and confine (and the warder shall receive and confine) in the penitentiary, according to such order, the person whose punishment is commuted. To carry into effect any commutation of punishment, the governor may issue his warrant directed to any proper officer, who shall obey and execute the same.

was addressed by the Supreme Court in Wells.

However, we do not hinge our decision today entirely on this theory. After the adoption of our first constitution, the Appellants cite a litany of cases in which the Governor has commuted non-capital sentences, including commutations which appear in the Ninth Session, *Journal of the Senate* (1871)—just one year prior to the 1872 adoption of the current version of Article VII, Section 11. Given this fact, we find it implicitly clear that the constitutional delegates in 1872 were aware that the Governor was exercising his pardoning power in this manner. As the constitutional drafters did not change Article VII, Section 11 to limit the Governor in this respect, we find it compelling to conclude the drafters understood the Governor possessed this power under the general grant to pardon offenses. In fact, the Appellants cite additional cases demonstrating the Governor continuously has exercised the power to commute non-capital offenses in West Virginia. As expressed by the Honorable Oliver Wendell Holmes, Justice, " '[i]f a thing has been practised [sic] for two hundred years by common consent, it will need a strong case' to overturn it." *Schick v. Reed,* 419 U.S. at 266, 95 S.Ct. at 385 (quoting *Jackman v. Rosenbaum Co.,* 260 U.S. 22, 31, 43 S.Ct. 9, 10, 67 L.Ed. 107 (1922)).

In light of all the foregoing discussion, we can find no reason now to limit the Governor's power in commuting non-capital cases. Therefore, we hold under the general pardoning power granted in Article VII, Section 11 of the West Virginia Constitution, the Governor of this State has the constitutional authority to grant commutations in non-capital cases.[26]

### III.

### CONCLUSION

For the foregoing reasons, we reverse the final orders of the Circuit Court of Kanawha County, set aside the writs of mandamus issued by the circuit court, and order the Governor's commutation orders for Appel-

---

26. As a result of our decision, the other issues raised by the parties, with respect to the mandamus and Appellant Ford's and Leach's ability to intervene, are now moot. In addition, we find Appellants fail to qualify for attorneys' fees pur-

lants Ford and Leach dated December 8, 1995, be reinstated.

Reversed and Governor's orders reinstated.

suant to *State ex rel. West Virginia Highlands Conservancy, Inc. v. West Virginia Division of Environmental Protection,* 193 W.Va. 650, 458 S.E.2d 88 (1995).